**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

RANDALL TRAPP,
      Petitioner

V.

LUIS SPENCER, Superintendent at MCI-NORFOLK,
      Defendant

)
)
)
)
)
)
)
)
)

Civil Action No.



## MEMORANDUM IN SUPPORT OF PETITION UNDER 28 USC SEC. 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

### I.    STATEMENT OF JURISDICTION

The Petitioner files this claim pursuant to 28 U.S.C. sec. 2254 after having

been tried and convicted for the crime of murder in the first degree in the Middlesex

Superior Court of the Commonwealth of Massachusetts on October 20, 1987. At

trial, the Petitioner raised the affirmative defense of insanity premised upon the

existence of a mental disease or defect due to an injury to the brain. He appealed

his conviction to the Supreme Judicial Court; however, prior to filing his appellate

brief, the Petitioner filed a new trial motion pursuant to Mass.R.Crim.P. 30 which

alleged ineffective assistance of counsel for the trial attorney's failure to inform the

experts in the case of the theory of defense and of the findings of other experts who

would testify. That motion was denied by the Superior Court, Sullivan, J. on

December 8, 1992. The original conviction and new trial motion denial

consolidated and the Petitioner raised issues from both matters in his direct appellate brief.

On July 31, 1996, the Supreme Judicial Court upheld the conviction and denial of the new trial motion. Petitioner requested counsel from the Committee for Public Counsel Services in order to file a new trial motion and was denied the assistance of counsel. On July 30, 1997, Petitioner filed, *pro se*, a "bare bones" motion for new trial which was denied by the Superior Court, Graham, J., on September 7, 1997. The Petitioner appealed and continued to seek legal representation. As the appeal of the denial of the new trial motion was pending before the Supreme Judicial Court, Petitioner obtained counsel from the Committee for Public Counsel Services who requested that the matter remain on the docket until such time as counsel could amend the motion. The Supreme Judicial Court allowed that request and did not remove the matter from the docket as the amended new trial motion wound its way through the Superior Court. After denial of the amended new trial motion, the Supreme Judicial Court denied the petitioner's appeal on April 27, 2004 without a hearing. The Petitioner moved the Court to rehear or reconsider which was denied on May 25, 2004.

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs petitions for habeas corpus filed pursuant to 28 U.S.C. 2254. It restricts the federal courts to address only exhausted issues and only those matters raised within one year of the finalization of conviction in state court. Given the history and background and unusual procedural posture of this case, this Honorable Court has jurisdiction to hear all claims from the Petitioner's initial new trial motion, direct

The Committee for Public Counsel Services assigned an attorney to represent Mr. Trapp on a motion for new trial asserting ineffective assistance of counsel for the representation he received at trial. Judge Sullivan heard the motion and denied it from the bench and through a written memorandum (New Trial T. at 73). Mr. Trapp appealed the denial of the motion for new trial which was consolidated with his direct appeal to the Supreme Judicial Court. The Court affirmed the convictions and the denial of the motion for new trial. Commonwealth v. Trapp, 423 Mass. 356 (1996).

Mr. Trapp requested that counsel be assigned to represent him in a second motion for new trial in order to attack the conviction collaterally as permitted by Massachusetts Rule of Criminal Procedure 30. The Committee for Public Counsel Services ("CPCS") denied the request. Mr. Trapp then filed a motion for new trial pro se which was denied. Mr. Trapp appealed to a single justice of the Supreme Judicial Court and again asked for the appointment of counsel from CPCS. CPCS assigned counsel to "screen" the case in order to determine whether or not Mr. Trapp would benefit materially from the appointment of counsel. Counsel determined that Mr. Trapp had some merit to his claims and would benefit from counsel, even in these late stages, in order to amend his pro se new trial motion.

Newly appointed counsel contacted the Supreme Judicial Court and explained the procedural history of the case and requested that the matter remain on the docket until such time as counsel could research and amend the new trial motion. The Court allowed that request.

5

In the intervening months, counsel moved for but did not receive funds to conduct certain medical tests. However, funds were raised privately and the Massachusetts General Hospital conducted a PET scan of Mr. Trapp's brain which revealed an injury to the right temporal lobe. Based on the result of the PET scan, the appellant moved to amend his motion for new trial. A judge other than the trial judge denied the motion on the papers but allowed for an amendment which included an explanation of the results of the PET scan. The appellant filed a notice of appeal and moved for a hearing before a Single Justice of the Supreme Judicial Court. That request was denied on April 27, 2004. On May 7, 2004, the Appellant timely filed a motion for reconsideration or rehearing before the Supreme Judicial Court which was denied without a hearing on May 25, 2004.

## III. STATEMENT OF THE RELEVANT FACTS

Randall Trapp killed Larry Norton on May 8, 1981. At trial for the homicide, Mr. Trapp argued that he suffered from an organic brain defect which altered his behavior rendering him not responsible for the actions he took on May 8, 1981. Testimony from lay witnesses revealed that Mr. Trapp was a victim of severe physical abuse throughout his childhood (T. at III-75-76, 83-84, 105, 107, 108). Mr. Trapp's father was a violent alcoholic and particularly violent toward Mr. Trapp in his youth, often hitting him indiscriminately and lifting him by the hair and throwing him. (T. at III-75, 105).

Mr. Trapp's sister, Jinene Ryan, her husband Charles Ryan, and Jo-Ann DeFusco, Mr. Trapp's former wife, all presented evidence of Mr. Trapp's mental

6

state. All three testified that Mr. Trapp had exhibited peculiar and alarming behavior in the months before the homicide. This behavior included initiating fights in which he would fail to defend himself (T. at III-77-78) as well as "crying and shaking a lot and rocking back and forth on the floor over nothing." (T. at III-83, 107-108). Mr. Trapp suffered from episodes during which he would harm himself; however, he had no recall of the event even shortly after it ended (T. at III-84).

Given Mr. Trapp's behavior, trial counsel ordered several diagnostic tests to determine whether he suffered from a physical impairment so severe as to render him not responsible for his actions. Included in the tests were a brain CT scan and a BEAM analysis as well as several psychological and neuropsychological exams (T. at IV-48, 64).

Expert testimony for the appellant revealed that Mr. Trapp had an enlarged temporal horn, a physical defect in the brain, which can lead to unusual behavior (T. at IV-14). Indeed, several experts testified as to the effects of this kind of brain injury as well as the results of Mr. Trapp's medical and neuropsychological examinations (T. at III-167, IV-17, 100). He was diagnosed as having intermittent explosive disorder and, based upon damage to the temporal lobe, organic personality disorder (T. at IV-118).

The Commonwealth's experts disagreed with the diagnoses and with the determination that Mr. Trapp suffered from a brain deformity. Dr. Paul New stated that there was no abnormal enlargement apparent on the CT scan (T. at IV-170-172). Dr. Martin Kelly determined that Mr. Trapp was not mentally ill and

6

suffered no brain defect (T. at V-44). Dr. Winkler agreed that no organic defect existed and that Mr. Trapp was not suffering from a mental illness (T. at V-97). Additionally, Dr. Winkler determined that the normal result of BEAM analysis combined with no abnormalities on the CT scan and neurological tests revealed no brain injury (T. at V-95-97). The jury convicted Mr. Trapp on all counts and he was sentenced to life in prison (T. at VII-20-24). Commonwealth v. Trapp, 423 Mass. 356 (1996).

In the intervening years, medical technology improved tremendously. The medical community now has access to PET (positron-emission-tomography) which is an imaging technique measuring body function. Rather than a stagnant snapshot, PET scans determine the function of the organ. It provides a much clearer image than a CT scan and it also shows much more of the organ itself. PET cameras take tens of thousands of measurements each second of a very small volume of tissue. Taken together, they create a three dimensional measurement of the entire organ. Rather than assessing a structural defect, the PET scan can determine whether or not there is a functional deficiency in the brain.

On June 25, 2001, a PET scan was conducted on Mr. Trapp's brain at the Massachusetts General Hospital. The scan revealed decreased metabolism in the temporal lobes of the brain, more pronounced on the right. This result suggests that the appellant's expert, Dr. Mark, was correct when he evaluated the original CT scans and noticed an enlargement of the right temporal horn. And, it confirms that the Commonwealth's expert, Dr. New, was incorrect when

he stated that there was no discernible physical defect. All of the other experts

who testified on behalf of the government relied on and agreed with Dr. New's

interpretation of the CT scan. The PET scan result calls into question the

Commonwealth's rebuttal to the appellant's insanity plea in that all of the

Commonwealth's experts relied on faulty readings of the CT scans.

## IV.    **ARGUMENT**

1)    AS A MATTER OF FEDERAL LAW, THE MASSACHUSETTS
COURTS ERRED IN INTERPRETING THE RULE REGARDING
RECIPROCAL DISCOVERY.

(A) WHEN IT DETERMINED THAT THE DEFENDANT SUFFERED NO
PREJUDICE AS A RESULT OF AN ORDER FOR RECIPROCAL
DISCOVERY, THE SUPREME JUDICIAL COURT ERRED SINCE THE
RECIPROCAL DISCOVERY ORDER AND USE OF THE INFORMATION
LEARNED BY THE GOVERNMENT VIOLATED THE DEFENDANT'S
RIGHT TO DUE PROCESS UNDER THE FIFTH AND FOURTEENTH
AMENDMENTS TO THE UNITED STATES CONSTITUTION.

The Supreme Judicial Court ruled, in the present case, that, the defendant

suffered no prejudice from the reciprocal discovery order regarding certain

medical tests since the use by the Commonwealth of such test results at trial did

not weaken the defendant's case in any way. Commonwealth v. Trapp, 423

Mass. 356, 363 (1996), Memorandum and Decision Dated April 27, 2004, Cowin,

J.. However, the prejudice suffered by the defendant amounted to a violation of

his Due Process Rights under the Fourteenth Amendment to the United States

Constitution.

Prior to trial, defense counsel ordered several diagnostic tests. Some

were helpful to the appellant's defense of insanity based upon a brain defect and

some were not. The court ordered the appellant to turn over all tests, whether or

not he planned to use them at trial (T. at V-15-18). The appellant argued both at

trial an on appeal that this order violated M.R.Cr.P. 14 regarding reciprocal

discovery. In relevant part, M.R.Cr.P. 14 states:

(3) *Reciprocal Discovery*
If the judge grants discovery or inspection to a defendant…the
judge may upon motion by the Commonwealth condition his order
by requiring the defendant to permit the Commonwealth to
discover, inspect, and copy any material and relevant evidence
discoverable under subdivision (a)(2) which the defendant intends
to use at trial…

In material ways, the Massachusetts rule, therefore, mirrors the federal

rule regarding reciprocal discovery. In relevant part, Federal Rules of Criminal

Procedure, Rule 16 states:

**(b) Defendant's Disclosure.**

**(1) Information Subject to Disclosure.**
**(A) Documents and Objects.** If a defendant requests disclosure
under Rule 16(a)(1)(E) and the government complies, then the
defendant must permit the government, upon request, to inspect
and to copy or photograph books, papers, documents, data,
photographs, tangible objects, buildings or places, or copies or
portions of any of these items if:
**(i)** the item is within the defendant's possession, custody, or control;
and
**(ii)** the defendant intends to use the item in the defendant's case-in-
chief at trial.
**(B) Reports of Examinations and Tests.** If a defendant requests
disclosure under Rule 16(a)(1)(F) and the government complies,
the defendant must permit the government, upon request, to
inspect and to copy or photograph the results or reports of any
physical or mental examination and of any scientific test or
experiment if:
**(i)** the item is within the defendant's possession, custody, or control;
and

10

**(ii)** the defendant intends to use the item in the defendant's case-in-chief at trial, or intends to call the witness who prepared the report and the report relates to the witness's testimony.
**(C) Expert witnesses.**--The defendant must, at the government's request, give to the government a written summary of any testimony that the defendant intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial, if--
**(i)** the defendant requests disclosure under subdivision (a)(1)(G) and the government complies; or
**(ii)** the defendant has given notice under Rule 12.2(b) of an intent to present expert testimony on the defendant's mental condition.

This summary must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.
**(2) Information Not Subject to Disclosure.** Except for scientific or medical reports, Rule 16(b)(1) does not authorize discovery or inspection of:
**(A)** reports, memoranda, or other documents made by the defendant, or the defendant's attorney or agent, during the case's investigation or defense; or
**(B)** a statement made to the defendant, or the defendant's attorney or agent, by:
**(i)** the defendant;
**(ii)** a government or defense witness; or
**(iii)** a prospective government or defense witness.

In the instant matter, both parties knew of the defense of insanity based

upon a brain defect. Defense counsel provided the government with tests which

he planned to use at trial including the CT scans, neuropsychological test results

and psychological reports; the government conducted an independent evaluation

of the appellant. Some test results neither confirmed nor denied the brain injury

and the appellant did not plan to use those tests at trial.

One of those tests was a BEAM test which had been conducted on behalf

of the defense. A BEAM test is a type of EEG (electroencephalograph) spectral

analysis with a specific computerized program designed to measure electrical

activity at the surface of the brain (T. at IV-63). It is unclear from the record why

trial counsel even ordered such a test as it is a poor diagnostic tool for the type of injury from which Mr. Trapp suffers (T. at IV-87). Despite the fact that a BEAM test measures only surface electrical responses and Mr. Trapp's injury lay deep within his brain, the Commonwealth used the result of the BEAM test to confirm for the jury that no brain injury existed (T. at V-96-97).

Indeed, the government averred that because the result of this test was in the range of normal, it confirmed their experts reading of the CT scan (T. at V-94). This misled the jury. First, the BEAM test measures surface brain activity (T. at IV-63-64). However, experts testified that the injury to Mr. Trapp's brain lay deep within the temporal lobe. The BEAM test could, therefore, be completely normal and Mr. Trapp's specific brain injury could still exist (T. at IV-87). However, Dr. Winkler, who testified on behalf of the prosecution, stated that the results of the EEG and BEAM test reflected normal brain activity (T. at V-93-97). Combined with his own and Dr. New's determination that the CT scan was normal, Dr. Winkler concluded that there was no objective evidence of neurological disease or defect (T. at V-100-101). During the government's closing argument, the prosecutor averred that the medical findings of a brain defect did not exist (T. at VI-51-52). He stated that there was no "credible history" of a mental illness (T. at VI-56).

To come to this conclusion, the government relied in part upon irrelevant medical data including the BEAM test results and other information provided by the appellant under objection. If the jury were faced with the differing expert opinions on CT scan readings and neuropsychological tests, it was a close

12

argument. Indeed, at the hearing on the initial motion for new trial, the trial judge

stated that the evidence regarding lack of criminal responsibility in the instant

matter was strong (New Trial T. at 65).

All of the examinations ordered prior to trial established the pile through

which trial counsel then sorted and sifted to determine the relevant from the

irrelevant facts. He then prepared his legal theories and planed his strategy. The

fact that counsel ordered a BEAM test reflects one potential angle for presenting

the defense argument to the jury. Due to the results of that test (and several

others which the appellant was forced to deliver to the government and upon

which the government relied), the appellant chose one particular path addressing

the brain injury. The court's order permitted the government to understand some

of the appellant's strategy in presenting his case to the jury.

It is impossible to say why certain tests which neither confirmed nor

denied the instance of the type of brain injury from which Mr. Trapp suffered were

ordered. The appellant may have chosen to conduct the BEAM analysis to

determine whether the injury deep inside Mr. Trapp's brain affected the surface

reading of the EEG. It did not. Therefore, this would not be a manner in which

to present the issues to the jury. Instead, the focus would be elsewhere, for

example on the CT scan.

The fact that the government gained access to this sifting process appears

to violate M.R.Cr.P. 14(3) which reflects Federal Rule of Criminal Procedure

16(b). On direct appeal, the Petitioner argued that delivering the test results to

the government violated his right against self-incrimination. See Defendant's

Appellate brief at 20-22.    Regardless of whether the order to hand over the tests violated the right protecting individuals from incriminating themselves or the Massachusetts Rule of Criminal Procedure which appears to rest in the Sixth Amendment right to counsel or the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution (all issues argued and exhausted in state court, See, i.e. Commonwealth v. Trapp, 423 Mass. 356 (1996), See Also, Memorandum and Decision dated April 27, 2004, the use of the tests did infringe on the appellant's right to a fair trial.

To detract from the essence of the argument regarding lack of criminal responsibility which virtually depended upon a defect deep in the brain, the issue became muddled through experts who discussed test results which neither confirmed nor denied the existence of temporal lobe damage. The jury became entrenched in medical jargon and examinations of various portions of the brain which had no relevance to temporal lobe pathology.

THE SIGNIFICANCE OF THE ERROR:

At trial, the appellant raised the defense of lack of criminal responsibility, asserting that he suffered from a brain defect which rendered him incapable of appreciating the wrongfulness of his conduct or of conforming his conduct to the requirements of the law. Commonwealth v. McHoul, 352 Mass. 544 (1967).    The Massachusetts standard for lack of criminal responsibility varies little from the federal law regarding an insanity plea. The Insanity Defense Reform Act ("IDRA") codified at 18 U.S.C. sec. 17 states, in relevant part,

**(a) Affirmative defense.**--It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts

constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.
18 U.S.C. sec. 17 (a).

The United States Constitution requires that the government prove each element of an offense beyond a reasonable doubt. In Re Winship, 397 U.S. 58 (1970). In federal court, if a defendant raises the affirmative defense of insanity, he must prove his insanity by clear and convincing evidence. Shannon v. United States, 512 U.S. 573, 581 (1994). In Massachusetts, if the defendant raises a reasonable doubt regarding his sanity, the Commonwealth must overcome that burden and prove responsibility for an offense beyond a reasonable doubt. Commonwealth v. Keita, 429 Mass. 843, 849-850, 853 (1999). Therefore, in Massachusetts, while the definition for insanity reflects the federal understanding, the burden of proof varies significantly. While the defendant bears the burden in federal court to establish insanity by clear and convincing evidence, in Massachusetts, the burden never shifts to the defendant and the government must prove criminal responsibility beyond a reasonable doubt.

To demonstrate his brain injury, the appellant in the instant matter presented both lay witnesses and experts. The lay witnesses, family members, discussed Mr. Trapp's troubled childhood and the changes in his behavior just prior to the homicide (T. at III-75-139). The experts explained the results of both physical defects in the appellant's brain as well as psychoneurological tests (T. at V-48-72).

The evidence revealed that Mr. Trapp's father severely abused him throughout his childhood (T. at III-75-76, 83-84, 105, 107, 108). Indeed, Charles Ryan, the appellant's brother in law, testified that Mr. Trapp's father hit Randall in the head, stomach, and chest, or "wherever his hands would land" (T. at III-75). Jinene Ryan, Mr. Trapp's sister, stated that their father hit Randall in the head with a beer bottle (T. at III-105). Rather than ask Randall to move, their father would grab him by the hair and throw him (T. at III-105). Indeed, Mr. Trapp left his parents' home at the age of 12 ostensibly because the situation became intolerable (T. at III-105).

Charles Ryan, Jinene Ryan, and Jo-Ann DeFusco, Mr. Trapp's former wife, all testified regarding peculiar and alarming behavior exhibited by Mr. Trapp in the months before the homicide. Charles Ryan spoke of Randall starting fights but then failing to defend himself (T. at III-77). He stated that during one barroom encounter, someone stabbed Mr. Trapp in the head with a broken beer bottle, he was dragged along the ground and then kicked and beaten over the head with a boot forcing a hospital visit (T. at III-78). In the months prior to the homicide, Mr. Trapp was, "crying and shaking a lot and rocking back and forth on the floor over nothing." (T. at III-83). He would pull out his own hair and punch himself; indeed after such episodes in which his pallor changed to an off-gray color, Mr. Trapp would deny the entire event (T. at III-84).

Jinene Ryan noticed changes in her brother's demeanor in the months prior to the homicide as well (T. at III-107). She related that, although previously a mild-mannered man, gentle to animals and others, Mr. Trapp had begun to act

violently even throwing Jinene Ryan's pet dog on one occasion (T. at III-107). She also described Randall's rocking, catatonic state behavior that her husband recalled (T. at III-108).

Experts for the appellant included psychologist Dr. Herbert Rothfarb, neurosurgeon Dr. Vernon Mark, neuropsychiatrist Dr. Donald Davidoff and neurologist Dr. Frank Ervin. Dr. Mark, a neurosurgeon recognized as an expert on brain injuries and specifically violence related to brain injuries, testified as to his interpretation of the several CT scans performed on Mr. Trapp's brain and the significance of the results. He noted that the most recent CT scan from 1986 showed a space in the brain which was somewhat enlarged on the right side (T. at IV-14). He stated that this space was called an enlarged temporal horn, a condition which was most often associated with disease or occurs as a result of a head injury (T. at IV-15-16).

The temporal horn is a functional unit and part of the limbic system which controls and regulates emotions (T. at IV-32-33). Those afflicted with injury or disease to that area of the brain suffer from behavioral abnormalities such as hyperreligiosity, decreased sex drive, a tendency to write copiously, and an increase in inappropriate and abnormal aggression (T. at IV-17, 32). People with temporal lobe injuries can harbor resentments and build up feelings of rage over the course of hours or even days which can become explosive (T. at IV-34).

Dr. Ervin, a neuropsychiatrist, testified that the clinical neuropsychological exam results and the CT scan results suggested that the behavior disorder from which Mr. Trapp suffered was due to brain damage, specifically to the temporal

lobe (T. at IV-100). However, he stated that some people with temporal lobe damage suffer intermittent behavioral difficulties which are successfully treated with medication (T. at IV-103). And, many with temporal lobe injuries, a fairly common deformity, suffer no mental illness (T. at IV-103). However, the combined abnormal result of the neuropsychological tests and the physical evidence of deep temporal lobe damage led Dr. Ervin to conclude that, at the time of the offense, Mr. Trapp suffered from a mental disease or defect which made it impossible for him to conform his conduct to the requirements of the law (T. at IV-116, 124). Further, Dr. Ervin stated that if there were no temporal lobe damage, he would not have diagnosed Mr. Trapp with an organic personality disorder (T. at IV-139, 141).

Psychologist Herbert Rothfarb noted that the results of the examinations he performed indicated that Mr. Trapp could have an organic brain syndrome (T. at III-147). And, Dr. Davidoff, a clinical neuropsychologist, diagnosed Mr. Trapp as having atypical or mixed organic brain syndrome with temporal lobe syndrome which is an illness known to affect a person's ability to control behavior (T. III-167-168). Further, he testified that if changes occur in the brain to establish the syndrome, those changes would be permanent (T. at III-171).

The government called several experts to dispute the claim that Randall Trapp suffered from an organic brain defect. Dr. Paul New stated that, based upon his reasonable and probable medical certainty, Randall Trapp's CT scans reflected no evidence of abnormality in his brain (T. at IV-172). Dr. Martin Kelly, a psychiatrist, noted that an individual could appreciate the wrongfulness of his

actions and yet suffer from a mental disease or defect preventing him from conforming his conduct to the confines of the law (T. at V-61-62, 63, 80). In Dr. Kelly's opinion, though, Randall Trapp did not suffer from a mental disease or defect which would render him incapable either of appreciating the wrongfulness of his conduct or of conforming his conduct to the confines of the law (T. at V-44).

Dr. Kelly generally agreed with the types of mental disorders listed in the DSM-III diagnostic manual, however he voiced his concerns regarding use of the manual and, in fact, declared that he did not use the manual to diagnose patients (T. at V- 61-62, 63, 66, 80). Dr. Kelly never conducted any research regarding brain injuries, yet he disagreed with the appellant's experts regarding the diagnosis of intermittent explosive disorder and organic personality disorder (T. at V-46-47, 58). He averred that even if Randall Trapp suffered from both an organic personality disorder and intermittent explosive disorder, neither condition would account for his behavior sufficiently to create a lack of criminal responsibility (T. at V-48).

Dr. Winkler, a neurologist, testified that the neuropsychological tests revealed no abnormal brain functions and, similarly, there were no abnormalities on Randall Trapp's CT scans (T. at V-97-98). Further, he opined that there was no objective evidence to indicate that Randall Trapp suffered from any neurological disease (T. at V-100). He based his opinion in part on Dr. New's interpretation of Randall Trapp's CT scan as normal (T. at V-111-112).

Therefore, the trial became a battle of the experts with the appellant's experts relying on a physical deformity in the brain and the government's experts

concluding that no physical deformity existed. To be convinced of the appellant's argument, it was imperative that the jury acknowledge a brain defect. Experts on both sides agreed that psychological and neuropsychological tests would not have been sufficient to diagnose a significant illness. Thus, the CT scan result emerged as the seminal issue at trial. The jury could have concluded that no brain injury existed because it believed the Commonwealth's experts. However, the Commonwealth's experts were mistaken.

On June 25, 2001, doctors at Massachusetts General Hospital performed a Positron – Emission Tomography (PET) scan on Randall Trapp's brain. PET scans measure body functions rather than structures. Because PET scans measure function, they can detect changes in organ performance even when difficult to assess structurally. At the time of trial, PET scans were not widely obtainable. However, Dr. Mark testified that if available, he would have ordered a PET scan on Randall Trapp to confirm his assessment of the temporal lobe damage reflected in the 1986 CT scan (T. at IV-58).

The June 25, 2001 PET scan revealed decreased metabolism in the medial aspects of the temporal lobes, more pronounced on the right. The radiologist concluded that this could result in memory impairment or interictal seizure foci (intermittent seizures). This result absolutely confirms Dr. Mark's interpretation of the appellant's CT scan. Further, it corroborates Dr. Davidoff's assertions at the hearing on the motion for new trial where he discussed "ictal phenomena" (New Trial T. at 24). Dr. Davidoff described temporal lobe pathology as including certain types of seizures in which there is an "absence" or

a dissociative state in which the patient "is not really connected with what is happening in the world" (New Trial T. at 24). Indeed, damage to the temporal lobe creates a disturbance of functions including memory, sequencing, language, hearing rhythms, arrhythmia, synthesizing parts into the whole, and seizure disorders (New Trial T. at 25).

Dr. Alan Fischman of the Massachusetts General Hospital reviewed the PET images in the instant case. He was neither hired by nor paid by the Petitioner. He objectively interpreted an objective test which definitively revealed a metabolic malfunction in the temporal lobes, specifically on the right side. Although it bolsters the Petitioner's argument at trial, this evidence is "new" in the sense that it is not merely cumulative; rather, it is a salient fact which was not brought to the jury's attention because it was unavailable that the time of trial. Indeed, it is a fact which directly contradicts the interpretations of the Commonwealth's experts. Given the Commonwealth's burden of proof, this is a significant new fact.

Dr. Mark explained, in an affidavit, that he consulted with Dr. Fischman as to the result of the PET scan. Dr. Fischman declared that the test indicated an abnormality in the anterior medial portion of the temporal lobe. Dr. Mark explained that this functional defect combined with the physical abnormality he discerned in the earlier CT scan and results of certain neuropsychiatric tests not yet performed would lead him to opine that the abnormality was significantly related to the behavior of the appellant.

By failing to assess the significance of the manner in which the Commonwealth used the BEAM test results at trial, the Supreme Judicial Court neglected the extreme prejudice to the defendant. That is, the results of the BEAM test, which may have, if positive, absolutely confirmed the existence of the brain injury (which is now apparent through the PET scan results), was utterly insignificant because it was negative. The Commonwealth's use of the test results misled the jury into believing that the defendant had no organic brain injury when, in fact, the injury lay deep within his brain and was not accessible through a surface exam such as the BEAM test.

Once the defendant called his sanity into question at trial and created a reasonable doubt regarding a mental defect, the Commonwealth bore the burden to prove criminal responsibility beyond a reasonable doubt. In the present case, the Commonwealth did that through the use of experts who all misread a CT scan. The objective, factual evidence of the more recent PET scan demonstrates the error of the Commonwealth's witnesses and casts real doubt on the justice of the conviction which relied on experts who misled and confused the jury in regard to the BEAM test results.

Because the government made use of the BEAM test to demonstrate that the defendant had no brain defect, it is impossible to know how the jury deliberated regarding the *mens rea* of this case. The errant discovery order, especially combined with objective new information, became prejudicial to the defendant when the government used the information to establish a lack of injury to the brain. The BEAM test results failed to demonstrate that fact, but the power

of a negative brain scan was devastating to the defense. The intricacies of an

insanity plea require that the evidence presented to the jury be comprehensible

and accurate. Experts can certainly disagree on the meaning of various test

results. However, since the defense had no intent to submit the data from the

BEAM test and it never should have been provided to the Commonwealth, it was

error of the court to state that no prejudice accrued to the defendant.

The use of the improperly disclosed evidence of a test result the

defendant did not intend to use at trial negatively impacted the defendant,

resulting in prejudice. The order and the use of the evidence violated the

defendant's right to present his defense in violation of Due Process under the

Fourteenth Amendment. The petitioner, therefore, respectfully requests that this

petition for habeas corpus be granted.

(B) GIVEN THE BURDEN OF PROOF IN MASSACHUSETTS REGARDING
THE AFFIRMATIVE DEFENSE OF INSANITY, THE SUPREME JUDICIAL
COURT ERRED IN DETERMINING THAT THE RECIPROCAL
DISCOVERY ORDER DID NOT VIOLATE THE GUARANTEE AGAINST
SELF-INCRIMINATION OF THE FEDERAL CONSTITUTION.

Criminal defendants enjoy a constitutional guarantee, embodied in the Fifth and

Sixth Amendments to the United States Constitution, made applicable to the states

through the Fourteenth Amendment to investigate and mount an adequate defense.

See, e.g. Powell v. Alabama, 287 U.S. 45, 67 (1932) (fundamental principles of

liberty and justice are applicable to the states through the Fourteenth Amendment

Due Process clause), Duncan v. Louisiana, 391 U.S. 145, 149 (1968) (discussing

the reach of the Fourteenth Amendment Due Process clause), Griffin v. California,

380 U.S. 609 (1965) (guaranteeing the right protecting a criminal defendant in a state case from self-incrimination). The result of the reciprocal discovery order shifted the burden of proof to the defendant to negate the test results. This was particularly troubling since the Petitioner challenged the jury instruction in the instant matter regarding insanity.

The Petitioner argued that the insanity instruction to the jury shifted the burden onto him to prove insanity when, in the Commonwealth of Massachusetts, the Commonwealth bears the burden of proving criminal responsibility. The criminal defendant need only raise a reasonable doubt regarding his lack of criminal responsibility. However, to prove Mr. Trapp guilty of murder, the Commonwealth introduced the results of a meaningless BEAM test which misled and confused the jury. The only reason the Commonwealth had this evidence was through the faulty discovery order.

Therefore, the discovery order itself and the use of the test results it yielded amounted to a violation of the Petitioner's constitutional rights. The Supreme Judicial Court erred by determining that the petitioner suffered no prejudice from the discovery order.

(C) WHEN IT DETERMINED THAT THE DEFENDANT SUFFERED NO PREJUDICE AS A RESULT OF AN ORDER FOR RECIPROCAL DISCOVERY, THE SUPREME JUDICIAL COURT ERRED SINCE THE RECIPROCAL DISCOVERY ORDER VIOLATED THE DEFENDANT'S SIXTH AMENDMENT RIGHT TO COUNSEL IN THAT THE ORDER INTERFERED BOTH WITH HIS ATTORNEY'S WORK-PRODUCT AND THE PRIVILEGED COMMUNICATIONS BETWEEN COUNSEL AND CLIENT.

with his protected rights to a fair trial. The Petitioner, therefore, respectfully

requests that this honorable Court grant the writ.

> 2)    COURT ERRED IN DETERMINING THAT NEWLY DISCOVERED
> EVIDENCE WAS MERELY CUMULATIVE WHEN IT, IN FACT,
> DEMONSTRATED EVIDENCE OF A MENTAL DISEASE OR DEFECT
> UNAVAILABLE AT TRIAL. BY FAILING TO PERMIT THE DEFENDANT
> TO PRESENT SUCH EVIDENCE TO A JURY, THE MASSACHUSETTS
> COURTS VIOLATED DEFENDANT'S RIGHT TO DUE PROCESS
> UNDER THE FOURTEENTH AMENDMENT.

In Blocker v. United States, 274 F.2d 572 (U.S.App.D.C. 1959), the

defendant pleaded not guilty by reason of insanity to murder in the first degree.

Several experts testified regarding the defendant's criminal responsibility. One

doctor found the defendant to be within the range of normal, but two testified that

he suffered from a sociopathic personality disturbance. They also testified,

however, that sociopathic personality disturbance was not a mental defect.

Shortly after the defendant's conviction, medical personnel associated with the

doctors (indeed, the Assistant Superintendent of the hospital) who testified that a

sociopathic personality disorder was not a mental disease or defect declared that

sociopathic personality disorder was, in fact, a recognized mental disease. The

defendant moved for a new trial which was denied by the trial court. The United

States Court of Appeals for the D.C. Circuit reversed the denial of the new trial

motion stating, "Blocker, his life at stake, was entitled to a verdict based upon the

most mature expert opinion available on an issue vital to his defense." Blocker v.

United States, 274 F.2d at 573.

In the instant case, Mr. Trapp submitted wholly new evidence to support

his new trial motion which confirms the correctness of his experts' opinion that he

suffered from a brain defect and challenges the government's argument which relied on a healthy brain. A new jury would not be forced to determine which experts were correct about the injury. Instead, their job would be to determine that since the appellant has an injury to the temporal horn creating a decreased metabolism and evidence of a seizure disorder, did that injury render the appellant incapable of conforming his conduct to the requirements of the law? This, in fact, should have been the only question addressed by the jury at trial.

Since the defendant can currently prove, through the use of modern technology not available at the time of his trial, that there is a significant doubt as to his sanity due to a brain defect or injury, the government would have to overcome that doubt by proof beyond a reasonable doubt that, regardless of the defect in the defendant's brain, he was criminally responsible for his actions. The fact that the trial became a battle between experts reading a CT scan differently – one essentially seeing no malformation or defect and others clearly noting an enlarged temporal horn, if the jury believed the government's experts, the court instructed them to deliberate no further on the issue of insanity.

However, since there is immutable proof that the Commonwealth's experts were mistaken, a jury would be required to deliberate on the burden of proof – that is, given the enlarged temporal horn causing reduced blood flow to that area of the defendant's brain and the expert testimony of both the Commonwealth and defense experts regarding the effect of such an injury, did the government prove, beyond a reasonable doubt, that the defendant was criminally liable for his actions on May 8, 1981?

believed the government's experts who declared that Mr. Trapp had no brain damage, it could cease deliberation at that point. The judge instructed the jury, "[n]ow if the Commonwealth proves beyond a reasonable doubt that the defendant was not suffering from a mental disease or defect at the time of the alleged event, *then you need go no further on the question of criminal responsibility*" (T. at VI-83, emphasis added).

Therefore, if the jury believed the government's experts who testified that the CT scan revealed no abnormality, they very likely discontinued discussion about criminal responsibility. The jury may never have addressed the copious evidence of psychological and psychoneurological examinations; it may have ignored the testimony of family members as insignificant if it concluded that the CT scans were normal. This proof of an abnormality calls into question the validity of the jury verdict. Indeed, if presented to a jury it evidence proving brain damage could alter the outcome. The PET scan result is newly discovered evidence which is not merely cumulative or impeaching. The judge, therefore, erred in denying the new trial motion.

In Massachusetts, when presenting newly discovered evidence, it is not sufficient for a defendant to demonstrate its mere existence; he must explain why the new evidence is material and how the new material casts real doubt on the justice of the conviction. Commonwealth v. Lo, 428 Mass. 45, 53 (1998) , Commonwealth v. Grace, 397 Mass. 303, 305-306 (1986). Evidence is material

utilized (New Trial T. at 30-35). However, the primary issue revolved around an enlargement of the CT scan and a videotape of Dr. Mark explaining each point on the scan.

when it has the potential to alter the outcome of a case. Commonwealth v.
Grace, *supra*.

This is consistent with notions of granting new trials in other jurisdictions
as well. For example, in State v. Weaver, 554 N.W. 2d 240 (Iowa 1996), the
Supreme Court of Iowa reviewed newly discovered evidence presented in a
second motion for new trial consisting of affidavits of witnesses who did not
testify at trial. In that case, the court examined the evidence in view of the state's
proof of guilt. Id. at 249.

Weaver involved a murder conviction in regard to the death of an infant
entrusted to the defendant. After trial, the defendant obtained affidavits of
witnesses who knew the infant's mother. The affidavits averred that several
weeks after the child's death, the child's mother recounted that her daughter had
hit her head against a coffee table. Two of the affidavits stated that as a result of
the accident, the baby lost consciousness and "went limp". Id. at 246. In
response to this information, the mother denied both the accident and relating the
story to the affiants. Id. at 247. This evidence had not been presented to the
jury.

The government argued that, even if the evidence were newly discovered,
it was not material or outcome determinative. Id. at 249. The Weaver trial was a
battle of the experts with some stating that the baby died of shaken baby
syndrome. However, at the new trial hearing, one expert testified that the
damage seen post-mortem could have been the result of chronic swelling as a
result of the fall described by the affiants. Id. at 250. Another testified that the

32

child's death may have been caused by a re-bleed of the earlier accident. Id. The court determined that, despite the State's claim of shaken baby syndrome and its experts who supported that claim, "the cause of death was disputed by the defendant's experts based in part on the newly discovered evidence." Id. The Iowa Supreme Court upheld the trial judge's new trial order. Id. at 250.

The Court of Appeals of Iowa reversed a trial court's denial of a motion for new trial in a very different setting in State v. Adamson, 542 N.W.2d 12 (Iowa App. 1995). In that case, the defendant was convicted of sexually assaulting his stepdaughter. At trial, the alleged victim's mother and brother testified that the claimant told them that the charges were untrue. Further, the claimant explained to her mother and brother that she filed charges only to get out of her parents' house. Id. at 14. To support his new trial motion, the defendant produced two teenagers, both close friends of the alleged victim who would testify that (1) the complaining witness stated that the charges were untrue and (2) that the complaining witness talked about raising false charges of abuse as a means to gain freedom from one's parents. Id. at 13-14.

The trial court found the evidence to be merely impeaching. However, the Court of Appeals disagreed and ruled that the new evidence addressed the central point of the case, whether or not the teenager lied about abuse charges. The court determined that the new evidence did more than impeach the complaining witness; it spoke to the actual guilt or innocence of the defendant and was, therefore material with the ability to alter the outcome of the case. Id. at 14.

33

In the present case, the new test results address the central issue at trial – whether or not Mr. Trapp suffered from a brain defect or injury which resulted in an inability to understand the wrongfulness of his conduct or conform his conduct to the requirements of the law. The experts at trial battled over the CT scans and whether or not they revealed an enlargement of the right temporal horn. The PET scan definitively demonstrates, however, that regardless of what may or may not be visible on a CT scan, the *functional capacity* of the brain is abnormal. Specifically, the type of metabolic decrease in the temporal lobes, particularly on the right, evidences the possibility of a seizure disorder. Rather than merely impeaching expert witnesses or bolstering the position raised at trial, this evidence presents a new and compelling fact. Scientific developments confirm the appellant's experts' position which was in direct opposition to that asserted by the government's experts.

At trial, Jinene and Charles Ryan, the appellant's sister and brother in law testified to Randall Trapp's bizarre behavior, several closed head injuries and the abuse Mr. Trapp suffered at his father's hand. They presented evidence that Mr. Trapp's alcoholic father repeatedly hit him (T. at III-75-76, 105). Further, Jo-Ann DeFusco, testified that Mr. Trapp once locked himself in the bathroom and set it on fire (T. at III-124).

Both Charles and Jinene Ryan testified about Mr. Trapp's occasional outbursts. He would cry and shake and rock on the floor, sometimes hitting himself or pulling out his own hair for no apparent reason (T. at III-85, 100, 108, 123). Charles Ryan described a change in Mr. Trapp's pallor asserting that,

34

"[h]e'd get an off gray color to him." (T. at III-84). Ms. DeFusco testified that Mr. Trapp could not handle rejection at all and that he had trouble controlling his emotions (T. at III-123).

Medical and psychological experts testified that this type of inexplicable behavior was indicative of an injury to the right temporal horn, a part of the limbic system which controls emotions (T. at III-168, IV-17, 32-35, 99-100-103). Further, when asked about Mr. Trapp's behavior on the night of the killing, including his solitude at a bar before the event, Dr. Ervin opined that Mr. Trapp may have been in an altered state (T. at IV-109-110). Indeed, when Mr. Trapp stated, in response to the victim's landlady, that he was having a bad dream, the situation may have seemed unreal to the appellant, as if in a dream (T. at IV-110). The government suggested at several points during the trial that this and other behavior reflected a man in full control of his faculties who thought quickly on his feet (T. at V-27-36).

After stabbing Larry Norton, Mr. Trapp did not immediately leave the scene to avoid detection. Instead, blood-covered, he went to the landlord, Donald Hutcheson's, bedroom. Rather than stabbing him, he demanded money and keys and ordered Mr. Hutcheson to come with him (T. at II-48, 50, 55). However, he allowed Mr. Hutcheson to put his dental plate in and put on a bathrobe (T. at II-52, 96). Obtaining only $20.00 from Mr. Hutcheson, the appellant stated that he would go upstairs to get more money (T. at II-56, 97). Yet, he did not go upstairs, he left with Mr. Hutcheson who deftly escaped from the appellant on foot as the appellant fumbled for the car keys (T. at II-63).

Rather than quick thinking, the appellant acted with no organizational logic at all. Instead of fleeing, he allowed at least one person to see him at the scene of the offense. However, he did not kill that person; rather he listened to Mr. Hutcheson and, in fact, followed his lead in regard to the money, the teeth and bathrobe, the car keys, and even the resulting pursuit. Indeed, as he fled, he drove on the incorrect side of the road (T. at II-118), he later stopped at a gas station but did not fill the car's empty tank with gasoline (T. at II-133-137). Not only did he allow witnesses to see him for long periods of time, but he also called attention to himself and risked being stopped by the authorities for reckless driving. Assuming that a rational person who killed a man would seek to escape detection, Mr. Trapp's actions demonstrated no rational thought.

This is particularly relevant now that the PET scan reveals an obvious malfunction of the limbic system of the brain. This type of injury can lead to dissociative states (New Trial T. at 24-25). The illusions alter the individual's relationship to the environment and the emotional response to it (New Trial T. at 25).

Indeed, Dr. Ervin's reaction to the events on the night of the killing, that Mr. Trapp was in a disorganized state (T. at IV-109) becomes significantly more persuasive than Dr. Kelly's interpretation of a quick-thinking man who could appreciate the wrongfulness of his actions (T. at V-27-36). The foundation for the expert opinions rests in the interpretation of the CT scan with Ervin noting a deformity and Kelly rejecting any abnormality. Now, with the definitive results of the PET scan demonstrating a reduced metabolic rate in the temporal horns,

more pronounced on the right, Dr. Kelly may need to revise his opinion as might all of the other experts for the prosecution.

Since the central issue at trial depended upon the opinion of experts, the appellant assumed the enormous responsibility of providing scientists who could persuade the jury of a brain defect and the types of behavior such a defect could produce. With the new evidence, the appellant's experts have a more concrete argument. Further, the government's experts have lost their foundation, that Mr. Trapp possessed a healthy brain. This new scientific test essentially confirms the appellant's explanation of his lack of criminal responsibility. In many ways, this case is like both Weaver, *supra*, and Adamson, *supra* in which the new evidence has the potential to sway the jury to the defense raised at trial. The appellant, therefore, urges this Honorable Court to adopt the reasoning of the Court of Appeals and the Supreme Court of Iowa in recognizing that the PET scan evidence is, indeed, material newly discovered evidence worthy of granting the appellant's motion for new trial as a matter of Federally protected Due Process. Denying the Appellant a trial involving the newly discovered evidence deprives him of Due Process as guaranteed by the 5th and 14th Amendments to the United States Constitution. Therefore, the Massachusetts courts' decisions denying the Appellant a new trial violate the United States Constitution.

Since the appellant currently has proof of a brain injury, the jury would not be misled by the use of irrelevant negative test results to demonstrate the lack of a brain injury. The jury would not be thusly confused. Instead, the new evidence of a functional disturbance in the temporal lobe necessitates a change of tack for

the Commonwealth's experts. Rather than comment upon a variety of irrelevant tests, the experts would all congregate around the central issue – the impact on an individual's brain when the temporal lobe is damaged. That is the argument the appellant presented to the jury. It is the only relevant argument. The essential issue of criminal responsibility never centered on whether certain medical tests reflected a normal result. It was and is whether the mental disease or defect from which the appellant suffers, a temporal lobe pathology, absolves him of criminal liability in the death of Larry Norton.

The new evidence combined with the disparate expert opinions at trial and the introduction of irrelevant test results challenges the validity of the jury verdict. The jury was misled into believing that Mr. Trapp did not have an injury to his temporal lobe. Indeed, the suggestion at trial was that all test results, including the CT scan, were within the range of normal and that there existed no organic explanation for the actions Mr. Trapp took on May 8, 1981 which resulted in Larry Norton's death. Based upon the PET scan result, this suggestion is false. Any "normal" test results of the surface of the brain which led to this conclusion must be discarded. By failing to grant a new trial upon this compelling evidence, the Massachusetts Courts violated Mr. Trapp's right to due process under the federal constitution. Chambers v. Mississippi, 410 U.S. 284, 302 (1973).

Information presented at trial led the jury to an erroneous conclusion regarding brain damage. Therefore, Mr. Trapp was denied Due Process of law pursuant to both the Fifth and Fourteenth Amendments to the United States Constitution in that erroneous evidence presented at trial guided the jury to a

faulty conclusion regarding a brain injury. Given that new test results affirm the
appellant's original argument that he suffers from an organic brain defect which
renders him incapable of appreciating the wrongfulness of his conduct or of
conforming his conduct to the requirements of the law, the motion judge erred in
denying the new trial motion. This evidence was a significant fact which, if
available at the time of trial, would have impacted the outcome of the case. If
nothing more, the battle would not have been whether Mr. Trapp suffered from a
brain injury; it would have been to what degree, if any, did Mr. Trapp's brain
injury impact his behavior on May 8, 1981.

Denial of the new trial motion impeded the defendant from presenting
relevant and expert evidence on an issue vital to his defense. Blocker v. United
States, *supra.* This amounted to a denial of Due Process. Therefore, the
Petitioner requests that this Honorable Court allow this writ.

3) THE SUPREME JUDICIAL COURT ERRED IN DETERMINING THAT
THE DEFENDANT RECEIVED EFFECTIVE ASSISTANCE OF COUNSEL
WHEN HIS LAWYER FAILED TO INFORM VARIOUS DEFENSE
EXPERTS OF THE DEFENDANT'S THEORY OF DEFENSE.

The Petitioner moved for a new trial prior to filing his direct appeal based
upon a claim of ineffective assistance of counsel. The argument raised by the
Petitioner in his motion and on direct appeal was that there was only a cursory
preparation for the affirmative defense of insanity made by counsel since the
experts had never met each other and at least one had never met counsel prior
to trial (Defendant's Appellate Brief at 24.) Two experts had concluded that Mr.
Trapp suffered from temporal lobe pathology, yet they had never been made

aware of the other's findings and testing procedures. Further, the presentation of the CT scan evidence, which represented the crux of the argument regarding a brain injury, failed to demonstrate to the lay jury the intricacies of CT scan technology and why and how the experts saw what they saw.

Counsel failed to utilize the services provided gratis to the defendant in order to elucidate the CT scan. On appeal, Mr. Trapp argued that the demonstrative aids available to counsel at the time of the trial would have helped to eliminate the issue of whether or not Mr. Trapp indeed had an enlarged temporal horn. Instead, the jury would have had the information it needed to discover that Dr. Mark's reading of the CT scan was the accurate reading.

Under the Sixth Amendment of the United States Constitution, a defendant seeking to illustrate ineffective assistance of counsel must show that his attorney made errors so serious that he was deprived of "reasonably effective assistance," and if so, that there is a reasonable probability that but for the substandard conduct, the results of the trial would have been different. Strickland v. Washington, 466 U.S. 668, 687 (1984).

The Supreme Judicial Court erred when it determined that Mr. Trapp had not met that burden. In fact, the attorney erred by putting expert witnesses on the stand without meeting them in advance of trial. Further, he failed to demonstrate the results of the CT scan in the most effective fashion. The visual aids explain why Dr. Mark observed an enlarged temporal horn and why the Commonwealth's experts' determination that no enlargement existed was error. The result would likely have been different for the defendant at his trial if the evidence had been

made more persuasive. Therefore, the error of failing to present a

comprehensive defense of insanity premised upon a brain injury and resulting

mental defect rose to a level beyond that of an ordinary, fallible attorney. The

error prejudiced the defendant by, in essence, denuding him of a defense – his

affirmative defense of insanity. The Petitioner has met his burden under

Strickland v. Washington, *supra*, and this Honorable Court should allow the writ.

## IV.    CONCLUSION

For all of the foregoing reasons, the appellant respectfully moves this

Court to grant his petition for writ of habeas corpus and to schedule a hearing.

RANDALL TRAPP
By his attorney,

Victoria L. Nadel
8 Winter Street
Boston, MA 02108
(617) 738-0474
BBO# 630411

668 N.E.2d 327
423 Mass. 356, 668 N.E.2d 327
**(Cite as: 423 Mass. 356, 668 N.E.2d 327)**

Supreme Judicial Court of Massachusetts,
Middlesex.
COMMONWEALTH
v.
Randall W. TRAPP.

Argued Feb. 8, 1996.
Decided July 31, 1996.

Defendant was convicted in the Superior Court, Middlesex County, Rudolph F. Pierce, J., of first-degree murder, armed robbery, and larceny. Defendant appealed. The Supreme Judicial Court, 396 Mass. 202, 485 N.E.2d 162, reversed and remanded. The Superior Court, John P. Sullivan, J., again convicted defendant of first-degree murder. Defendant appealed. The Supreme Judicial Court, Liacos, C.J., held that: (1) defendant does not have Sixth Amendment right to counsel during expert's interview of defendant with respect to criminal responsibility; (2) instructions on criminal responsibility were proper; (3) any error in failing to instruct that alcohol and drug consumption were relevant to third prong of malice caused no substantial likelihood of miscarriage of justice; (4) lack of evidence for prosecutor's closing argument that defense hired experts who testified for defendant did not prejudice defendant; (5) juror and judge reacted properly to telephone call by victim's sister; (6) any error in ordering discovery of reports that defense counsel obtained while investigating case, but did not intend to use at trial, did not prejudice defendant; and (7) allowing prosecutor to add two experts to witness list on day of jury empanelment did not entitle defendant to continuance.

Affirmed.

West Headnotes

**[1] Criminal Law ⚖~641.3(6)**
110k641.3(6) Most Cited Cases
Commonwealth expert's _Blaisdell_ interview of defendant on criminal responsibility is not "critical stage" of criminal process, and, thus, defendant does not have Sixth Amendment right to counsel during the interview. U.S.C.A. Const.Amend. 6; M.G.L.A. Const. Pt. 1, Art. 12; Rules Crim.Proc., Rule 14(b)(2)(B), 43C M.G.L.A.

**[2] Criminal Law ⚖~641.3(2)**
110k641.3(2) Most Cited Cases

**[2] Criminal Law ⚖~641.3(9)**

110k641.3(9) Most Cited Cases

**[2] Criminal Law ⚖~641.3(10)**
110k641.3(10) Most Cited Cases
Sixth Amendment provides right to counsel at every critical stage of criminal process, and person accused has that right at postarraignment line-ups, but not postarraignment photographic identification sessions. U.S.C.A. Const.Amend. 6; M.G.L.A. Const.Amend. Art. 12.

**[3] Criminal Law ⚖~822(9)**
110k822(9) Most Cited Cases

**[3] Criminal Law ⚖~822(11)**
110k822(11) Most Cited Cases
Instruction on criminal responsibility was proper despite occasional use of "finding language" that had potential to reverse burden of proof; read as whole, instruction was infused with and surrounded by proper statements of allocation of burden and standard of proof.

**[4] Criminal Law ⚖~1038.1(1)**
110k1038.1(1) Most Cited Cases
Defense attorney's failure to object to instruction in prosecution for first-degree murder warranted review pursuant to statute on review of capital cases to determine whether verdict was against law or weight of evidence. M.G.L.A. c. 278, § 33E.

**[5] Criminal Law ⚖~805(1)**
110k805(1) Most Cited Cases

**[5] Criminal Law ⚖~822(1)**
110k822(1) Most Cited Cases
Supreme Judicial Court looks to entire charge and does not require trial judges to use any particular words in instructions so long as they convey legal concepts properly.

**[6] Criminal Law ⚖~1173.2(3)**
110k1173.2(3) Most Cited Cases
(Formerly 203k341)
Any error in failing to instruct that alcohol and drug consumption were relevant in first-degree murder prosecution to third prong of malice-- defendant's commission of act which reasonably prudent person would know was likely to result in death--would create no substantial likelihood of miscarriage of justice, since defendant stabbed victim 18 times, there was only smallest iota of evidence of intoxication, and attorney argued intoxication and mental state to jury with respect to theories of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

668 N.E.2d 327
423 Mass. 356, 668 N.E.2d 327
**(Cite as: 423 Mass. 356, 668 N.E.2d 327)**

extreme atrocity or cruelty; defendant could not seriously contend that he lacked specific intent to kill or specific intent to do grievous bodily injury.

## [7] Criminal Law ☜822(1)
110k822(1) Most Cited Cases

Instruction is evaluated as whole for interpretation that reasonable juror would place on judge's words.

## [8] Criminal Law ☜1119(1)
110k1119(1) Most Cited Cases

Objection that defendant was wearing "clothes he normally wears at MCI Gardner" was not record support for claim that defendant was compelled to stand trial in prison clothing; nothing in record indicated that the clothing was official garb for incarcerated persons.

## [9] Criminal Law ☜720(5)
110k720(5) Most Cited Cases

Fact that defense hired experts who testified for defendant was proper subject of prosecutor's closing argument.

## [10] Criminal Law ☜1171.3
110k1171.3 Most Cited Cases

Lack of evidence for prosecutor's closing argument that defense hired experts who testified for defendant did not prejudice defendant; even though no expert was questioned as to whether defense provided compensation for testimony, docket disclosed that defense counsel received approval to expend funds to hire the experts.

## [11] Criminal Law ☜719(1)
110k719(1) Most Cited Cases

## [11] Criminal Law ☜720(1)
110k720(1) Most Cited Cases

## [11] Criminal Law ☜720(6)
110k720(6) Most Cited Cases

Closing argument should comment on evidence and inferences drawn from evidence and may not touch on matters not in evidence.

## [12] Criminal Law ☜855(8)
110k855(8) Most Cited Cases

## [12] Criminal Law ☜868
110k868 Most Cited Cases

Juror and judge reacted properly to telephone call by crime victim's sister to ask how trial was going; after juror's spouse answered telephone and told juror, he immediately put stop to any conversation on the subject and related incident to court officer when trial resumed, and judge then conducted individualized inquiry and found no extraneous influence.

## [13] Criminal Law ☜1166(10.10)
110k1166(10.10) Most Cited Cases

Any error in allowing Commonwealth discovery of tests of defendant's psychological condition, even though defendant did not intend to use them at trial, did not prejudice defendant; prosecution used test results only in rebuttal for opinion that even testing conducted by defense demonstrated lack of mental disease or defect, results were not put in evidence, and results did not contain any testimonial statements by defendant. Rules Crim.Proc., Rule 14(a)(3)(A), 43C M.G.L.A.

## [14] Criminal Law ☜589(1)
110k589(1) Most Cited Cases

## [14] Criminal Law ☜629(11)
110k629(11) Most Cited Cases

Allowing prosecutor to add two experts to witness list on day of jury empanelment did not unduly surprise defendant or entitle him to continuance in prosecution for first-degree murder: defense attorney had at least six days to prepare to cross-examine the witnesses on medical and psychological testing of defendant, court was not in session during three of those days, attorney thus had ample time to prepare, defendant provided relevant test results one month before trial, and prosecution found witnesses approximately at time trial began.

## [15] Criminal Law ☜586
110k586 Most Cited Cases

## [15] Criminal Law ☜629.5(2)
110k629.5(2) Most Cited Cases

## [15] Criminal Law ☜629.5(4)
110k629.5(4) Most Cited Cases

Trial court has significant discretion in deciding whether late-discovered or late-disclosed witnesses should be excluded from testifying, or whether a continuance is appropriate.

## [16] Criminal Law ☜959
110k959 Most Cited Cases

Admitting affidavits of trial counsel and one prosecution expert in deciding new trial motion, refusing to allow appellate counsel to call those

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

witnesses in order to cross-examine them, and relying on the affidavits is proper when motion and affidavits of party raise no substantial issue. Rules Crim.Proc., Rule 30(c), 43C M.G.L.A.

**\*\*328\*357** Charles W. Rankin, Boston, for defendant.

**\*\*329** David W. Cunis, Assistant District Attorney, for Commonwealth.

Before LIACOS, C.J., and WILKINS, ABRAMS, LYNCH and FRIED, JJ.

LIACOS, Chief Justice.

In October, 1987, a Middlesex County jury returned a guilty verdict against the defendant, Randall W. Trapp, on an indictment charging murder in the first degree. The defendant had been retried after we overturned his initial conviction on the ground that improperly admitted character evidence caused prejudice. See *Commonwealth v. Trapp,* 396 Mass. 202, 485 N.E.2d 162 (1985).

The evidence regarding the homicide itself and identification of the perpetrator was substantially the same at both trials. On the evidence submitted at the second trial, the jury could have concluded that Trapp encountered one Lawrence Norton at a bar in Boston on the night of May 7, 1981. Trapp accompanied Norton to a house in Stoneham where Norton lived as a tenant. In the early morning hours of May 8, 1981, Norton's landlord, who lived downstairs in the same house, heard a loud thump emanating from Norton's bedroom. Soon thereafter a man wielding a knife and covered in blood, whom the landlord identified as Trapp, burst into the landlord's apartment. Trapp demanded the landlord's money and **\*358** automobile keys. The landlord complied. The landlord, against his will, accompanied Trapp to the landlord's mother's automobile, but then was able to escape to a neighbor's house. Trapp fled in the automobile.

The landlord called the police, and on returning to his home, he and the police subsequently found Norton dead, lying in a pool of blood in his bedroom, stabbed eighteen times. Shortly after the time of the killing, a gasoline station attendant saw Trapp, covered in blood, in the stolen car. [FN1] Police later located the landlord's mother's automobile and found evidence that Trapp had driven it in his flight. Police arrested Trapp on May 26, 1981. [FN2]

FN1. The attendant identified Trapp at trial.

FN2. A more elaborate description of the facts is found in *Commonwealth v. Trapp,* 396 Mass. 202, 485 N.E.2d 162 (1985).

The second trial centered around the prosecution's ability to prove that Trapp was criminally responsible for his actions at the time of the homicide. The seven-day trial included testimony by seven experts on the issue of the defendant's criminal responsibility, four for the defense and three for the prosecution. The defense also presented the testimony of several lay witnesses who had known Trapp before the killing. These lay witnesses described Trapp's allegedly bizarre behavior on other occasions prior to the homicide. The jury deliberated for two days, asked one question during that time, and returned a special verdict finding Trapp guilty of murder in the first degree based on extreme atrocity or cruelty.

[1] 1. *Right to counsel at* Blaisdell *interview.* When a criminal defendant notifies the Commonwealth that criminal responsibility will be contested at trial, the Commonwealth may have an expert interview the defendant with respect to criminal responsibility issues. See Mass.R.Crim.P. 14(b) (2)(B), 378 Mass. 874 (1979); *Blaisdell v. Commonwealth,* 372 Mass. 753, 767-769, 364 N.E.2d 191 (1977). Prior to the examination, Trapp requested that his counsel be present during that interview. He asserts that the judge's denial of that motion violated his right to assistance of counsel under the Sixth Amendment to the United States Constitution and art. 12 of the Declaration of Rights of the Massachusetts Constitution.

[2] The Sixth Amendment provides a right to counsel at every "critical stage" of the criminal process, and so a person accused has that right at postarraignment line-ups, but not at **\*359** postarraignment photographic identification sessions. Compare *United States v. Wade,* 388 U.S. 218, 236-237, 87 S.Ct. 1926, 1937-1938, 18 L.Ed.2d 1149 (1967), and *Gilbert v. California,* 388 U.S. 263, 269-272, 87 S.Ct. 1951, 1954-1957, 18 L.Ed.2d 1178 (1967), with *United States v. Ash,* 413 U.S. 300, 321, 93 S.Ct. 2568, 2579, 37 L.Ed.2d 619 (1973). In **\*\*330***Commonwealth v. Delaney,* 404 Mass. 1004, 1004-1005, 537 N.E.2d 141 (1989), we expressly left open the issue whether a *Blaisdell* interview is a critical stage requiring that a videotape of such an interview be made. We did not consider the right of counsel to be present at the interview. Cf. *Estelle v. Smith,* 451 U.S. 454, 470 n. 14, 101 S.Ct. 1866, 1876-1877 n. 14, 68 L.Ed.2d 359 (1981) (expressly reserving this issue). See also the exhaustive

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

analysis in *United States v. Byers*, 740 F.2d 1104 (D.C.Cir.1984) (en banc) (plurality opinion). Although the decision to undergo psychiatric evaluation is a critical stage, see *Estelle v. Smith*, *supra* at 470, 101 S.Ct. at 1876-1877, the interview itself is not. *Byers*, *supra* at 1118-1121. We accept this view.

Trial counsel requested only that he be physically present at the interview. The alternative of videotaping such interviews was not raised at trial. While we agree with the *Byers* plurality that videotaping might be a sound idea, this issue is not before us. See *id.* at 1121. Cf. *Commonwealth v. Diaz*, 422 Mass. 269, 271-273, 661 N.E.2d 1326 (1996) (videotaping of prearraignment custodial interrogations); *Commonwealth v. Fryar*, 414 Mass. 732, 742 n. 8, 610 N.E.2d 903 (1993) (same). When individual circumstances warrant, criminal defendants remain protected by the judge's discretion to allow defense counsel to attend the *Blaisdell* interview, or to require videotaping. See *Delaney*, *supra* at 1005, 537 N.E.2d 141. There is no abuse of that discretion shown, and, hence, no error.

2. *Instructional Errors.*

[3][4][5] a. *Criminal responsibility.* Trapp's appellate counsel assigns error to the judge's instructions regarding criminal responsibility. In light of trial counsel's lack of objection to the charge, we examine any error pursuant to G.L. c. 278, § 33E (1994 ed.). We look to the entire charge, *Commonwealth v. Torres*, 420 Mass. 479, 490, 651 N.E.2d 360 (1995), and do not require trial judges to use any particular words in their instructions so long as they convey the legal concepts properly, *id.* at 484, 651 N.E.2d 360, citing *Commonwealth v. Sinnott*, 399 Mass. 863, 878, 507 N.E.2d 699 (1987).

The judge began his instruction entirely properly, reciting the definition of lack of criminal responsibility from *Commonwealth v. McHoul*, 352 Mass. 544, 547, 226 N.E.2d 556 (1967), and stating that the Commonwealth had the burden to prove beyond a **\*360** reasonable doubt that Trapp was criminally responsible, see *Commonwealth v. Kostka*, 370 Mass. 516, 536-537, 350 N.E.2d 444 (1976). The judge then elaborated on these concepts, and on occasion used "finding language" that has the potential to reverse the burden of proof. See, e.g., *Commonwealth v. Adorno*, 407 Mass. 428, 430, 553 N.E.2d 942 (1990). Read as a whole this charge, however, was infused with and surrounded by proper statements of the allocation of the burden and the

standard of proof. See *Commonwealth v. Roberts*, 423 Mass. 17, 18-19, 666 N.E.2d 475 (1996). See also *Commonwealth v. Goudreau*, 422 Mass. 731, 737-739, 666 N.E.2d 112 (1996) (model charge). There was no error.

[6] b. *Intoxication and third prong of malice.* This case came to trial shortly after the decision of *Commonwealth v. Grey*, 399 Mass. 469, 505 N.E.2d 171 (1987). Counsel and the judge discussed the implications of that opinion, and the judge instructed the jury that any intoxication or drug use was relevant to premeditation, extreme atrocity or cruelty, and to the first two prongs of malice. While Trapp's direct appeal was pending, we decided *Commonwealth v. Sama*, 411 Mass. 293, 582 N.E.2d 498 (1991), holding that alcohol and drug consumption were relevant to the third prong of malice because alcohol and drug use can affect the subjective knowledge of the defendant. *Id.* at 296-299, 582 N.E.2d 498. Appellate counsel asserts that Trapp should have had the benefit of a *Sama* instruction.

Trial counsel did not object on this score, and so we look only for any substantial likelihood of a miscarriage of justice. The jury returned their verdict of murder in the first degree on the theory of extreme atrocity or cruelty, expressly rejecting a premeditation theory. This case is therefore not one in which error in a third-prong instruction is rendered harmless because a premeditation verdict makes clear that the jury did in fact base their verdict on the (properly instructed) **\*\*331** first prong of malice. See. e.g., *Commonwealth v. Judge*, 420 Mass. 433, 441-442, 650 N.E.2d 1242 (1995); *Commonwealth v. Wallace*, 417 Mass. 126, 134-135, 627 N.E.2d 935 (1994). Nevertheless, on the facts here, with a victim stabbed eighteen times, it cannot be contended seriously that there was not either a specific intent to kill or specific intent to do grievous bodily injury. There was only the smallest iota of evidence that Trapp was intoxicated at all, and trial counsel argued intoxication and Trapp's mental state to the jury with respect to the extreme atrocity or cruelty theory. There is no substantial likelihood that a miscarriage of justice occurred.

[7] **\*361** c. Hunter *error.* Trapp cites our decision in *Commonwealth v. Hunter*, 416 Mass. 831, 837, 626 N.E.2d 873 (1994), and asserts that the judge's instructions defining extreme atrocity or cruelty were impermissibly vague. The judge did provide the jury with a list of "factors" to consider in deciding the issue of extreme atrocity or cruelty. Within that list, after describing some of the factors, the judge stated,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"You may look to other evidence.... [S]ome of the other relevant and significant factors you should consider are...." After finishing a list of factors the judge concluded: "So in the final analysis, the issue is left for you to determine if the mode of inflicting death was so shocking as to amounts [*sic*] to extreme atrocity or cruelty." We evaluate the instruction as a whole, looking for the interpretation a reasonable juror would place on the judge's words. The language to which Trapp points is taken out of context, and the charge as a whole properly focused the attention of a reasonable juror. See *Commonwealth v. Rosa,* 422 Mass. 18, 31-32, 661 N.E.2d 56 (1996) (instructions that followed list of factors focused jury attention on the factors alone). There was no objection on this score at trial, and there was no substantial likelihood of a miscarriage of justice. [FN3]

> FN3. We note also that this trial occurred before the decision in *Commonwealth v. Hunter,* 416 Mass. 831, 626 N.E.2d 873 (1994), and that the rule in *Hunter* applies only prospectively. See *Commonwealth v. Semedo,* 422 Mass. 716, 726, 665 N.E.2d 638 (1996).

Trapp also claims that it was error for the judge not to expressly tell the jury that the degree of murder was to be found by them, especially because the judge did expressly state that the jury should return a verdict of the highest degree of guilt that the evidence would support beyond a reasonable doubt. Although we believe that the requested instruction is the preferred practice, we have never required it. See, e.g., *Commonwealth v. Gaskins,* 419 Mass. 809, 813, 647 N.E.2d 429 (1995); *Commonwealth v. Smiledge,* 419 Mass. 156, 161, 643 N.E.2d 41 (1994) (claim of error in failing to so instruct was "meritless"). In the absence of an objection at trial, we decline to consider the defendant's invitation to set down a prospective common law rule.

3. *Miscellaneous.* The defendant assigns numerous other points of error. We address them seriatim.

[8] a. *Trial in prison garb.* Appellate counsel asserts that the judge improperly compelled Trapp to stand trial in prison clothing. See *Estelle v. Williams,* 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976); *Commonwealth v. Jackson,* 388 Mass. 98, 445 N.E.2d 1033 (1983). At that point, the judge ordered jury empanelment to begin on a Friday

afternoon, the record indicates an objection by trial counsel on the basis that Trapp was wearing the "clothes he normally \*362 wears at MCI Gardner." There is nothing in the record to indicate that this clothing was official garb for incarcerated persons, and there is therefore no record support for this claim of error.

[9][10][11] b. *Prosecutor's closing argument.* The prosecutor, during his closing, stated that the experts who testified for the defense had been hired by the defense. This is a proper subject for closing argument. *Commonwealth v. Grimshaw,* 412 Mass. 505, 511, 590 N.E.2d 681 (1992), citing *Commonwealth v. O'Brien,* 377 Mass. 772, 777-778, 388 N.E.2d 658 (1979). Trapp correctly notes, however, that the prosecutor neglected to lay any foundation regarding this argument. No expert was questioned as to whether the defense had provided compensation for testimony. Closing argument should comment on the evidence and inferences drawn from the evidence, and may not touch matters not in evidence. *Commonwealth v. Kozec,* 399 Mass. 514, 516- 517 & n. 2, 505 N.E.2d 519 (1987). Nevertheless, these comments were not objected to, and there was no \*\*332 prejudice. The docket discloses that defense counsel received approval to expend funds to hire these experts. The prosecutorial comment was not false according to official documents in the record, and the relevant portion of the prosecutor's closing was entirely correct. Compare *O'Brien, supra* at 777-778, 388 N.E.2d 658 (disapproving use of term "hired gun" to describe defense expert). [FN4]

> FN4. Two other claims of prosecutorial misconduct in closing argument are without merit.

[12] c. *Extraneous influences on jurors.* On the Monday morning that closing arguments were set to begin, one juror related to a court officer that on returning home from court the previous Friday, he learned that a friend of the victim's sister had telephoned the juror's house and asked how the trial was going. At a hearing with the juror and both counsel, which the judge conducted on the Monday, it became clear that the juror's wife had taken the telephone call, and that when she told him of it the juror had immediately put a stop to any conversation on the subject. The judge specifically asked if the juror had spoken to any other person about the incident, and the juror stated that he had not. In coming forward the juror did exactly what he was supposed to do. In light of the individualized

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

inquiry, the lack of objection of either counsel after the voir dire, and the judge's discretion in addressing issues of extraneous influence on jurors discovered during trial, *363 that the judge too did exactly what he was supposed to do. See, e.g., *Commonwealth v. Samuel,* 398 Mass. 93, 96, 495 N.E.2d 279 (1986). See also *Commonwealth v. Kamara,* 422 Mass. 614, 615, 664 N.E.2d 825 (1996).

[13] d. *Prosecution discovery.* Before the second trial, defense counsel had several medical and scientific tests conducted regarding the defendant's psychological condition. The Commonwealth moved to discover the results of tests conducted for the defendant in November, 1986, and a Brain Electrical Activity Mapping (BEAM) test given in 1987. The judge, over objection, allowed that discovery.

In criminal cases, reciprocal discovery allows the prosecution to obtain "statements of persons, or reports of physical or mental examinations of any person or of scientific tests or experiments," Mass.R.Crim.P. 14(a)(2), 378 Mass. 874 (1979), that "the defendant intends to use at trial." Mass.R.Crim.P. 14(a)(3)(A), 378 Mass. 874 (1979). Assuming, without deciding, that it was error to order discovery of reports that defense counsel obtained while investigating the case and that defense counsel did not intend to use at trial (see *Commonwealth v. Haggerty,* 400 Mass. 437, 441, 509 N.E.2d 1163 [1987] ) and had not showed to any testifying expert witnesses, there was no prejudice. This sort of nonconstitutional error demands remedy only when "the error possibly weakened his case in some significant way." *Commonwealth v. Schulze,* 389 Mass. 735, 741, 452 N.E.2d 216 (1983). The prosecution used the defense test results in rebuttal, with prosecution experts offering the opinion that even the testing conducted by the defense demonstrated that Trapp had no mental disease or defect. On cross-examination, at least one such test was shown to the defense experts who testified. The test results themselves were not put in evidence, nor did they contain any testimonial statements by the defendant. Assuming error, it was not prejudicial.

[14] e. *Late-disclosed rebuttal witnesses.* On the day of jury empanelment the prosecutor added two experts to the witness list. Over objection and denial of a request for a continuance, the judge allowed these two medical experts to provide their opinions regarding medical and psychological testing of the defendant done prior to this second trial. This testimony came on the sixth and seventh days after

the trial began, in rebuttal to defense expert testimony regarding the testing.

[15][16] The trial judge has significant discretion in deciding *364 whether late-discovered or late-disclosed witnesses should be excluded from testifying, or whether a continuance is appropriate. See *Commonwealth v. Baldwin,* 385 Mass. 165, 176, 431 N.E.2d 194 (1982) (discretion in fashioning remedy). Cf. *Commonwealth v. Paradise,* 405 Mass. 141, 150, 539 N.E.2d 1006 (1989) (factors considered in determining violation of, and **333 remedy for, prosecutor's duty to turn over exculpatory evidence). Here defense counsel had at least six days to prepare to cross-examine the two rebuttal witnesses. Indeed for three of those days court was not in session, for the Columbus Day holiday weekend began the day after jury empanelment. "[T]he prosecution's disclosure was sufficiently timely to allow the defendant 'to make effective use of the evidence in preparing and presenting his case.' " *Baldwin, supra* at 175, 431 N.E.2d 194. There is no evidence of bad faith in the late disclosure. See *Commonwealth v. Donovan,* 395 Mass. 20, 24, 478 N.E.2d 727 (1985). The defense provided the relevant test results only one month before trial, and the record indicates that the prosecution found the rebuttal witnesses approximately at the time trial began. See *Commonwealth v. Costello,* 392 Mass. 393, 400, 467 N.E.2d 811 (1984) (prosecution had "an apparently blameless role in the delay"). The judge was well within his discretion in determining that the defendant was not unduly surprised, and that in any event ample time existed to allow defense preparation. [FN5]

> FN5. Appellate counsel argues in a motion for a new trial that there was ineffective assistance of counsel at trial. These claims contend only that trial counsel inadequately prepared expert witnesses and used a less than persuasive format to present certain scientific evidence. These claims are meritless. In the words of the motion judge, who was also the trial judge: "This was essentially a problem of the evidence and not the performance of counsel. In fact, counsel's presentation at the second trial was not only to the point but eliminated many of irrelevant matters covered during the first trial.... Advocacy in the second trial appears to have been at least as effective on the issue of lack of criminal responsibility as that presented during the first trial. Both times

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the trial strategy failed."

Trapp proffers one claim of procedural error in the judge's consideration of the new trial motion. The judge admitted affidavits of trial counsel and of one prosecution expert. The judge refused to allow appellate counsel to call those witnesses in order to cross-examine them, and then the motion judge relied on the affidavits in his decision. This is entirely proper when the motion and affidavits of the parties raise no substantial issue. Mass.R.Crim.P. 30(c)(3), 378 Mass. 900 (1979).

Our review of the assigned errors and the entire record gives us no reason to use our extraordinary power, *365G.L. c. 278, § 33E, to overturn or reduce the verdict. There was no error mandating reversal, and the judgments of the Superior Court, [FN6] including the judgment of conviction for murder in the first degree, are affirmed.

> FN6. The jury also returned guilty verdicts on indictments charging armed robbery and larceny of a motor vehicle. We consolidate the errors assigned thereto with our statutorily mandated review of the murder charges. See, e.g., *Commonwealth v. Lawrence,* 404 Mass. 378, 379 n. 1, 536 N.E.2d 571 (1989). Trapp addresses no claims of error to those convictions. We recognize that the claims of error with respect to criminal responsibility are equally applicable to those indictments. No such claim presents a substantial risk of a miscarriage of justice in this case.

*So ordered.*

423 Mass. 356, 668 N.E.2d 327

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## COMMONWEALTH OF MASSACHUSETTS

**MIDDLESEX, ss.**

**SUPERIOR COURT**
**CRIMINAL ACTION 81-948**

### COMMONWEALTH

**vs.**

### RANDALL TRAPP



## MEMORANDUM OF DECISION ON DEFENDANT'S MOTION FOR NEW TRIAL

On October 20, 1987, the defendant, Randall Trapp, was convicted by a jury of murder in the first degree based on extreme atrocity or cruelty. That conviction was affirmed after G.L. c. 278, § 33E review. *Commonwealth v. Trapp*, 423 Mass. 356 (1996). The defendant now moves for a new trial based on the results of a PET (positron emission tomography) scan of his brain conducted on June 25, 2001. The trial judge having retired, the motion was assigned to me in May 2002.

I will not rehash the evidence presented at the trial. See *Commonwealth v. Trapp*, *supra* at 357-358. The victim was stabbed eighteen times by the defendant. There was testimony that the defendant appeared excited, with bulging eyes, immediately after the stabbing. His family members testified that he had experienced a turbulent childhood, that his father had been physically abusive and that they had seen the defendant engage in episodes of bizarre behavior. Countering that testimony, there was also evidence that the defendant acted with guile and rationally at the time of the killing, including his statement to the elderly woman who came to investigate the noise when he attacked the victim, and that shortly after the killing he robbed an occupant of the house where the killing occurred, stole a car owned by another occupant, fled the scene in the stolen automobile, and

later tried to set the car on fire.

At trial the defendant presented a lack of criminal responsibility "defense". Both the defendant and the Commonwealth presented experts. The results and significance of a CAT (computer axial tomography) scan and a BEAM (a type of electroencephalograph) analysis performed on the defendant's brain were presented and the experts disagreed as to whether the defendant exhibited any brain injury or brain deficiency, with the Commonwealth's experts opining that the defendant did not suffer from a brain defect.

On May 24, 2001, the defendant underwent a PET scan at Massachusetts General Hospital. Alan J. Fischman, Ph.D. read the PET scan, in part, as follows. "The distribution of tracer reveals mildly decreased metabolism in the medial aspects of the temporal lobes bilaterally; more pronounced on the right." The defendant has presented nothing about the qualifications of Alan J. Fischman. More important, the defendant presents no qualified expert's opinion to the effect that the PET scan results support the trial testimony of the defendant's experts. (Dr. Mark's affidavit is "prospective" and is dated May 24, 2001, before the PET scan was conducted. The affidavit of counsel cannot be used to fill the lacunae in the forensic evidence.)

Furthermore, Dr. Fishman's reading of the scan seems less than dramatic:"mildly decreased metabolism in the medial aspects of the temporal lobes." The defendant argues that the PET scan conducted on June 25, 2001 is probative of his brain function twenty years earlier, but provides no evidentiary basis for that assertion. And, assuming the reading of the scan supports the testimony of the defendant's experts, it is cumulative of the other diagnostic tests upon which they based their opinions at the trial.

Even if I were to consider that the PET scan reading qualifies as newly discovered evidence,

2

it falls far short of constituting the type of evidence which casts doubt on the justice of the

defendant's conviction. *Commonwealth v. Salvati*, 420 Mass. 499, 506 (1995). Nor does the

affidavit of counsel and the report of the PET scan present a substantial issue warranting a hearing.

*Commonwealth v. Jones,* 432 Mass. 623, 633 (2000).

 The Motion for New Trial is **DENIED** without a hearing.

Robert A. Mulligan
Justice of the Superior Court

Date: June 27, 2002

3

COMMONWEALTH OF MASSACHUSETTS
SUPERIOR COURT
MIDDLESEX COUNTY

DOCKET NO. Criminal 81-2948

COMMONWEALTH OF MASSACHUSETTS )
                                )
                                )
V.                              )
                                )
RANDALL TRAPP                   )
                                )
                                )

## MOTION FOR RECONSIDERATION

Now here comes defendant, RANDALL TRAPP, by and through

counsel and moves this Honorable Court to reconsider its ruling of June 27,

2002. As reason therefore, the Defendant states the following:

1. This Honorable Court denied the Defendant's motion for new trial on June 27, 2002.

2. In part, this Court denied the motion because , "[t]he defendant has presented nothing about the qualifications of Alan J. Fischman." Memorandum of decision on Defendant's Motion for New Trial at 2.

3. Further, this Court concluded that the result of the recent PET scan was insignificant. Memorandum of Decision on Defendant's Motion for New Trial at 2.

4. However, the Defendant has moved for leave to amend the motion for new trial with supplemental affidavits and curricula vitae to support his argument.

5. The supplemental affidavit provided by Dr. Vernon Mark confirms the significance of the PET scan result.

6. Dr. Mark has consulted with Dr. Fischman and they agree that the function of the temporal lobe is abnormal supporting Dr. Mark's initial evaluation of a structural defect.



# The Commonwealth of Massachusetts

SUPREME JUDICIAL COURT
FOR SUFFOLK COUNTY
ONE BEACON STREET, 4TH FLOOR
BOSTON, MASSACHUSETTS 02108
WWW.SJCCOUNTYCLERK.COM

MAURA S. DOYLE
CLERK
CASE INFO (617) 557-1100
BAR INFO (617) 557-1050
FAX (617) 557-1145

ASSISTANT CLERKS
LILLIAN C. ANDRUSZKIEWICZ  (617) 557-1184
GEORGE E. SLYVA  (617) 557-1185
ERIC B. WETZEL  (617) 557-1186
FAX  (617) 557-1033

April 27, 2004

Victoria L. Nadel, Esquire
8 Winter Street
12th Floor
Boston, MA 02108

RE:  No. SJ-1997-0563

COMMONWEALTH
v.
RANDALL TRAPP

Middlesex Superior Court
No. 81-2948

NOTICE OF DOCKET ENTRY

You are hereby notified that on April 27, 2004, the following

was entered on the docket of the above referenced case:

Memorandum and Decision:...."All the defendant's motions treated as
an application for leave to appeal to the full court are DENIED."
(Cowin, J.)

Maura S. Doyle, Clerk

To:  Victoria L. Nadel, Esquire
     David W. Cunis, Assistant District Attorney
     Alexandra T. Camp, Assistant District Attorney
     Middlesex Superior Court Dept.



# The Commonwealth of Massachusetts
## SUPREME JUDICIAL COURT
FOR SUFFOLK COUNTY
ONE BEACON STREET, 4TH FLOOR
BOSTON, MASSACHUSETTS 02108
WWW.SJCCOUNTYCLERK.COM

**MAURA S. DOYLE**
CLERK
CASE INFO (617) 557-1100
BAR INFO (617) 557-1050
FAX (617) 557-1145

ASSISTANT CLERKS
LILLIAN C ANDRUSZKIEWICZ (617) 557-1184
GEORGE E. SLYVA (617) 557-1185
ERIC B WETZEL (617) 557-1186
FAX (617) 557-1033

May 25, 2004

Victoria L. Nadel, Esquire
8 Winter Street
12th Floor
Boston, MA 02108

.

RE:    No. SJ-1997-0563

COMMONWEALTH
        v.
RANDALL TRAPP

Middlesex Superior Court
No. 81-2948

### NOTICE OF DOCKET ENTRY

You are hereby notified that on May 7, 2004, the following was

entered on the docket of the above referenced case:

MOTION for Reconsideration or Rehearing, filed by Victoria L. Nadel
with attached certificate of service. (05/25/04-MOTION for
Reconsideration or Rehearing is DENIED without hearing. By the
Court (Cowin, J.))

Maura S. Doyle, Clerk

To:    Victoria L. Nadel, Esquire
        David W. Cunis, Assistant District Attorney
        Alexandra T. Camp, Assistant District Attorney
        Middlesex Superior Court Dept.

CERTIFICATE OF SERVICE

I hereby certify that a copy of the within motions and all supporting

documents were this day mailed by First Class United States mail to the

Defendant:

> Luis Spencer, Superintendent of MCI-Norfolk
> MCI-Norfolk
> 2 Clark Street
> P.O. Box 43
> Norfolk, MA 02056

I certify that a copy of the within motions and all supporting documents

were this day also mailed by First Class United States mail to the Attorney

General of the Commonwealth of Massachusetts:

> Office of the Attorney General Thomas Reilly
> One Ashburton Place
> Boston, MA 02108

Signed under the penalties of perjury, May 25, 2005.

Victoria L. Nadel