UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RANDALL TRAPP,
      Petitioner,


      v.                                    CIVIL ACTION NO.
                                            05-11103-PBS

LUIS SPENCER,
Superintendent at
MCI-Norfolk,
      Respondent.



REPORT AND RECOMMENDATION RE:
RESPONDENT'S MOTION TO DISMISS PETITION FOR
WRIT OF HABEAS CORPUS
(DOCKET ENTRY # 9)

September 26, 2005

BOWLER, U.S.M.J.

      Respondent Luis Spencer ("respondent"), Superintendent of

The Massachusetts Correctional Institute in Norfolk,

Massachusetts ("MCI-Norfolk"), moves to dismiss the above styled

petition for writ of habeas corpus filed under 28 U.S.C. § 2254

("section 2254") as untimely pursuant to 28 U.S.C. § 2244(d)

("section 2244(d)") of the Antiterrorism and Effective Death

Penalty Act of 1996 ("the AEDPA").  Petitioner Randall Trapp

("petitioner"), an inmate at MCI-Norfolk, attacks his 1987

conviction for murder in the first degree rendered in the

Massachusetts Superior Court Department (Middlesex County) ("the

trial court") on the following grounds:  (1) the trial court's

order for reciprocal discovery requiring petitioner to turn over

medical test results to the Commonwealth that petitioner did not intend to use at trial violated petitioner's federal constitutional rights to due process and to counsel under the Fifth, Sixth and Fourteenth Amendments (ground one); (2) newly discovered evidence in the form of a May 2001 positron emission tomography scan ("PET scan") of petitioner's brain establishes a brain injury to support the insanity defense (ground two);[1] and (3) trial counsel rendered ineffective assistance by failing to present the brain injury in a clear manner and to communicate with defense experts regarding the defense of insanity in light of the brain injury (ground three). As explained <u>infra</u>, the state courts addressed and rejected these or similar arguments on direct and/or collateral review.

On August 10, 2005, this court held a hearing, accepted various exhibits proffered by petitioner and took the matter under advisement. Petitioner was present at the hearing and represented by counsel ("current counsel"). The motion to dismiss (Docket Entry # 9) is therefore ripe for review.

<u>BACKGROUND</u>

---

[1] The supporting memorandum elucidates a violation of the Fifth and Fourteenth Amendments. (Docket Entry # 2, p. 36). During the August 10, 2005 hearing, petitioner argued a violation of due process because the Commonwealth thus failed to prove murder in the first degree under <u>In Re Winship</u>, 397 U.S. 358 (1970).

On October 21, 1981, a Middlesex grand jury returned an indictment against petitioner for first degree murder.[2]  On October 2, 1982, a jury returned a guilty verdict on the first degree murder count and petitioner received the statutorily mandated life sentence.  <u>See</u> Mass. Gen. L. ch. 265, § 2. Petitioner's appeal of the conviction and the denials of post trial motions were successful.  On November 13, 1985, the SJC set aside the verdicts and remanded the case for a new trial on the basis that improperly admitted character evidence prejudiced petitioner.  <u>Commonwealth v. Trapp</u>, 485 N.E.2d 162 (Mass. 1985).

At the second trial, which took place over the course of seven days, the jury again found petitioner guilty on the charge of first degree murder as well as on the charges of armed robbery and larceny of a motor vehicle.  The facts,[3] as found by the SJC, recount how petitioner and the victim initially met in a bar on the evening of May 7, 1981.  Petitioner accompanied the murder victim to the house where the victim rented space above the landlord who lived downstairs.  Early on the morning of May 8, 1981, the landlord heard a loud thump emanating from the victim's bedroom.  Shortly thereafter, Trapp entered the landlord's

---

[2]  Additional indictments were returned for armed robbery and larceny.  <u>Commonwealth v. Trapp</u>, 485 N.E.2d 162, 163 (Mass. 1985).

[3]  Although not germane to the present motion, this court briefly recounts the facts in order to create a more complete record.

apartment "wielding a knife and covered in blood." Commonwealth
v. Trapp, 668 N.E.2d at 329.  After demanding automobile keys and
money from the landlord, who complied, Trapp fled the scene in
the landlord's mother's automobile.  When the police entered the
victim's bedroom, they found the victim, who had been stabbed 18
times, in a pool of blood.  A gasoline attendant also saw Trapp a
short time after the killing in the stolen automobile and
described him as covered in blood.  Commonwealth v. Trapp, 668
N.E.2d at 329.

     At trial, seven experts, four for petitioner and three for
the Commonwealth, testified to the issue of petitioner's criminal
responsibility.  The jurors heard the testimony from the experts
and their interpretations of results of a computer axial
tomography scan ("CAT scan").  They also heard expert testimony
regarding the results of a test known as a "BEAM" analysis that
trial counsel ordered but did not intend to use at trial.  BEAM
analysis is a type of electroencephalograph analysis that
measures electrical activity at the surface of the brain.[4]  In
contrast to the BEAM analysis which only measured electrical
activity at the surface, the CAT scan showed an enlarged area in
"the right temporal horn" where "spinal fluid fills within the
temporal lobe."  (Ex. 1, Affidavit of Dr. Vernon Mark).

---

     [4]  Petitioner's organic brain defect, however, lies deep in the
brain in the area of the temporal lobes which are associated with
emotion.

The jurors did not hear expert testimony regarding the results of a PET scan, a test that petitioner did not undergo until June 2001, more than 13 years after the second trial and 20 years after the stabbing.  PET scans were in their infancy at the time of the second trial.[5]  Whereas a CAT scan only measures the anatomical structure of the brain, the imaging technique of a PET scan measures the function of the brain.  (Ex. 1, Affidavit of Dr. Vernon Mark).  The results of the June 2001 PET scan performed at Massachusetts General Hospital showed "mildly decreased metabolism in the medial aspects of the temporal lobes bilaterally" and indicated an abnormality in that area.  (Ex. 1, Affidavit of Dr. Vernon Mark; Ex. 1, Radiological Consultation of Dr. Alan J. Fischman).

As indicated above, the jury convicted petitioner of first degree murder on October 20, 1987.  Petitioner filed a timely notice of appeal the following day.  During the pendency of the direct appeal, petitioner also filed a motion for a new trial.  On November 20, 1989, petitioner filed with the SJC a motion to stay the direct appeal pending a decision on the motion for a new trial.  On December 8, 1992, the trial judge issued a Memorandum

_____

[5]  Dr. Vernon Mark ("Dr. Mark"), who testified for petitioner at the second trial, explains that "technology has improved dramatically" since the time of the second trial and "[t]he medical community now has access to PET" scans which measure brain function and "can determine if the metabolism of the brain is abnormal."  (Ex. 1, Affidavit of Dr. Vernon Mark).

and Order denying the foregoing motion for a new trial after conducting a hearing in April 1991.

On July 31, 1996, exercising plenary review pursuant to section 33E of Massachusetts General Laws chapter 278, the SJC affirmed the convictions.  Petitioner thereafter sought certiorari review in the United States Supreme Court which denied the petition on December 16, 1996.[6]  See Trapp v. Commonwealth, 519 U.S. 1095 (1996) (No. 96-6551).

In affirming the convictions, the SJC rejected the argument petitioner presently raises in ground one.  In particular, the SJC assumed it was error for the trial court to order discovery of the test results that petitioner did not intend to use at trial but concluded that the error was not prejudicial. Commonwealth v. Trapp, 668 N.E.2d 327, 332 (Mass. 1996).  The SJC reasoned that the test results were not put into evidence, did not contain testimonial statements on the part of petitioner and were only used in rebuttal by the prosecution.  Commonwealth v. Trapp, 668 N.E.2d at 332.  A post appeal motion for a new trial motion resurrected the argument regarding the discovery error. In an April 27, 2004 Memorandum and Decision, a single justice of the SJC denied the claim inasmuch as SJC had addressed the issue in Commonwealth v. Trapp, 668 N.E.2d at 332.

---

[6] As explained infra, it is at this point that the one year limitations period began to run under the AEDPA.

6

The SJC's July 31, 1996 opinion also rejected an ineffective
assistance of trial counsel claim similar to the one raised in
ground three.  Relegating the argument to a footnote, the SJC
discussed the claim as follows:

> Appellate counsel argues in a motion for a new trial that
> there was ineffective assistance of counsel at trial.  These
> claims contend only that trial counsel inadequately prepared
> expert witnesses and used a less than persuasive format to
> present certain scientific evidence.  These claims are
> meritless.  In the words of the motion judge, who was also
> the trial judge:  "This was essentially a problem of the
> evidence and not the performance of counsel.  In fact,
> counsel's presentation at the second trial was not only to
> the point but eliminated many of irrelevant matters covered
> during the first trial . . . . Advocacy in the second trial
> appears to have been at least as effective on the issue of
> lack of criminal responsibility as that presented during the
> first trial.  Both times the trial strategy failed."

Commonwealth v. Trapp, 668 N.E.2d at 333 n. 5.

Notably, on July 31, 1997, petitioner filed a second motion
for a new trial as well as a motion requesting court appointed
counsel.  On September 9, 1997, the motion judge denied the
motions without a hearing.  On October 16, 1997, petitioner filed
a motion for leave to appeal the denial to a single justice of
the SJC[7] as well as a motion for appointment of counsel.  In
December 1997, the SJC's docket reflects that a clerk telephoned
the Committee for Public Counsel Services ("CPCS") to inquire
about the status of petitioner's request for an attorney.  The
docket reflects that the CPCS was still evaluating the request at

---

[7] Petitioner "properly" filed this motion with the SJC.  See
Mass. Gen. L. ch. 278, § 33E; 28 U.S.C. § 2244(d)(2).

that time.

On November 9, 1998, the SJC issued a standing order calling for the dismissal of the case due to lack of prosecution. Petitioner responded with a pro se letter in late November. On December 11, 1998, the SJC allowed the request for the case to remain on the docket.

On May 10, 1999, CPCS assigned petitioner's case to current counsel. She filed an appearance in the trial court two days later on May 12, 1999. She also telephoned a clerk at the SJC and asked the court to stay activity in the case until she could review the papers. In a May 13, 1999 letter, current counsel also asked the SJC's "'office to inform me if [petitioner's] matter is to be called as I believe that if further action is required in this case, the initial pleadings will be filed in Superior Court.'" (Docket Entry # 10, Att. 2). Thus, as noted by the single justice in the April 27, 2004 Memorandum and Order, current counsel "requested that no action be taken on the gatekeeper petition pending resolution of motions pending in the Superior Court."[8]  (Docket Entry # 2, Attached Exhibit).

Notwithstanding these requests, on November 15, 1999, the SJC issued a second standing order calling for dismissal for

---

[8]  The first motion current counsel filed in the trial court after the May 12, 1999 appearance was a motion to obtain funds for a PET scan and other tests and a motion to obtain evidence from trial. Current counsel filed these motions in the trial court on June 6, 2000.

failure to prosecute the case.  On November 22, 1999, current counsel filed a letter asking the court to retain the case on the docket.  The SJC allowed the request on December 7, 1999.

In April 2000, current counsel contacted Dr. Mark as well as Dr. Herbert Rothfarb, a psychologist who testified on behalf of petitioner at the second trial, about the injury to petitioner's brain.  She spoke again with Dr. Mark in May 2000.  In June 2000, current counsel filed a motion in the trial court seeking funds to conduct tests on petitioner's brain, including a PET scan.[9] The trial court denied the motion for funds as well as a motion for reconsideration.[10]

On November 6, 2000, the SJC issued a third standing order calling the case for dismissal absent good cause.  Current counsel again responded promptly asking the case to remain on the SJC's docket.  On November 29, 2000, the SJC allowed the request.

In July and October 2001, current counsel had additional communications with Dr. Mark about petitioner's brain injury.  On October 5, 2001, current counsel filed a motion for a new trial in the trial court based on the results of the PET scan.[11]  On

---

[9]  See the previous footnote.

[10]  Petitioner's family eventually secured funds for the PET scan which was performed at Massachusetts General Hospital on June 25, 2001.

[11]  The SJC's docket reflects that current counsel also filed an amended motion for a new trial with the SJC on October 11, 2001.  Meanwhile, the SJC issued additional standing orders on

9

June 27, 2002, the motion judge issued a three page Memorandum
and Order denying the motion.  He characterized the results of
the PET scan as "less than dramatic" in the sense of the finding
that petitioner had "'mildly decreased metabolism in the medial
aspects of the temporal lobes.'"  (Docket Entry # 2, Attached
Exhibit).  On reconsideration, the motion judge adhered to this
initial decision.

Petitioner appealed the denials of the motion for a new
trial and the motion for reconsideration to the SJC.  Treating
all of petitioner's motions, including the October 2001 amended
motion for a new trial, as an application for leave to appeal to
the full court, the single justice issued the aforementioned
April 27, 2004 Memorandum and Order.  She denied leave to appeal
to the full court and addressed the claim regarding the "new"
evidence as follows:

> The results of the PET scan are not new evidence.  The
> defendant's experts testified at trial that the defendant
> suffered from a brain disorder and stated that tests
> performed on defendant supported their conclusion.  The PET
> scan results merely confirm the interpretation of the prior
> tests.  The same expert, Dr. Vernon Mart[sic], who testified
> at trial that, based on certain tests, the defendant had an
> enlarged temporal horn (an alleged abnormality) now states
> that the PET scan indicates the same abnormality.  Thus, the
> PET scan results are merely cumulative.  Nor does defendant
> present evidence to establish that a PET scan conducted in
> 2001 is probative of defendant's brain function twenty years
> earlier.  Finally, even if the results of the PET scan did

May 7, 2002, and May 7, 2003, calling the case for dismissal
absent good cause.  Each time, the SJC allowed the prompt
requests filed by current counsel to retain the case on the
court's docket.

not constitute newly discovered evidence, it does not cast
doubt on the justice of defendant's conviction.

(Docket Entry # 2, Attached Exhibit).  On May 7, 2004, current
counsel filed a motion for reconsideration with the single
justice of the SJC.  On May 25, 2004, the single justice denied
the motion for reconsideration.

By letter also dated May 7, 2004, Dr. Jonathan D. Lieff
("Dr. Lieff"), a practicing neuropsychiatrist, provided current
counsel with a copy of his 12 page forensic neuropsychiatric
report.  The report comprehensively details the head injuries and
the tragic and unprovoked beatings by his father that petitioner
suffered as a child.  Petitioner experienced additional injuries
and periods of unconsciousness during adolescence.  After
interviewing petitioner on July 23, 2003; reviewing the medical
data, the familial and social history and the behavior preceding
the homicide; and conducting a series of neuropsychological
tests, Dr. Lieff concluded that petitioner "clearly has a brain
injury and a lesion documented on both a PET scan and CAT scan."
(Ex. 1, Forensic Neuropsychiatric Evaluation).  He opined that,
"It is my strong opinion that the repeated head trauma, and
subsequent brain injury and temporal lobe lesion, are directly
related to [petitioner's] violent behavior on May 8, 1981."  (Ex.
1, Forensic Neuropsychiatric Evaluation).

On May 25, 2005, exactly one year after the single justice
denied reconsideration, petitioner, through current counsel,

filed the present habeas petition.  Current counsel candidly
admits she was under the mistaken impression that the one year
limitations period did not begin to run until the SJC made its
"ultimate ruling--in this case denying the new trial motion."
(Docket Entry # 12, ¶ 20).  Throughout this time period,
petitioner, who suffers from an organic brain injury, voiced his
concern about protecting his federal rights and preserving all
issues for federal review.  (Docket Entry # 12, ¶¶ 21 & 23).
Indeed, throughout the time current counsel represented
petitioner, he has always "been concerned" about protecting and
preserving the issues for federal review.  (Docket Entry # 12, ¶
21).


## DISCUSSION

Prior to the AEDPA's enactment, "a prisoner faced no strict
time constraints in filing a petition for writ of habeas corpus."
Villegas v. Johnson, 184 F.3d 467, 468 (5th Cir. 1999).  The
AEDPA dramatically altered these circumstances by imposing a one
year limitations period for habeas petitions.  28 U.S.C. §
2244(d)(1) ("section 2244").

For habeas challenges to state convictions which became
final prior to the AEDPA's April 24, 1996 enactment, this circuit
affords petitioners a one year grace period running from April
24, 1996.  See Gaskins v. Duval, 183 F.3d 8, 9 (1st Cir. 1999)

(applying the reasoning and the one year grace period applicable to section 2255 motion in <u>Rogers v. United States</u>, 180 F.3d 349, 351-352 (1st Cir. 1999), to Gaskins' section 2254 petition).  As reasoned in <u>Rogers</u>, a conviction becomes final for purposes of applying the grace period when the Supreme Court denies an application for certiorari on direct review.[12]  <u>Rogers v. United States</u>, 180 F.3d at 352; <u>accord</u> <u>Shatney v. Strange</u>, 1999 WL 391116 at * 2 (D.R.I. May 20, 1999) ("circuit courts have consistently held that a judgment becomes final upon the completion of certiorari proceedings in the United States Supreme Court").  Petitioner's conviction therefore became "final" within the meaning of section 2244(d)(1)(A) and the one year period began to run when certiorari proceedings on direct review concluded on December 16, 1996.[13]

Although the one year period forecloses relief for petitioners who choose to ignore it, the statute serves the "strong public interest" of encouraging "the prompt assertion of habeas claims."  <u>David v. Hall</u>, 318 F.3d at 347.  The one year

---

[12]  In contrast, on state collateral review, the 90 day period in which a petitioner could have but did not file a petition for certiorari with the Supreme Court does not toll the one year limitation period.  <u>See</u> <u>David v. Hall</u>, 318 F.3d 343, 345 (1st Cir.), <u>cert.</u> <u>denied</u>, 540 U.S. 815 (2003).

[13]  Petitioner does not claim to fall under a statutory exception listed in subsections (B), (C) and (D) of section 2244(d)(1).  He does, however, invoke the equitable exception of equitable tolling.

time limit promotes judicial efficiency, conserves judicial resources, "safeguards the accuracy of state court judgments by requiring resolution of constitutional issues while the record is fresh, and lends finality to state court judgments within a reasonable time." Acosta v. Artuz, 221 F.3d 117, 123 (2d Cir. 2000). As aptly explained by the Second Circuit in Acosta, section 2244(d) "'was Congress' primary vehicle for streamlining the habeas review process and lending finality to state convictions.'" Acosta v. Artuz, 221 F.3d at 123.

Under section 2244(d)(2), however, petitioner receives the benefit of a statutory provision which tolls the one year period during the time a "properly filed" post-conviction state application for collateral review is "pending." 28 U.S.C. § 2244(d)(2); Gaskins v. Duval, 183 F.3d at 9-10 (applying section 2244(d)(2) tolling provision to section 2254 petition involving conviction which became final prior to April 24, 1996). Section 2244(d)(2) provides that:

> The time period during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d)(2).

The exclusion of this time period comports with principles of comity and encourages a petitioner to "first exhaust his state court remedies before seeking federal habeas relief." Gaskins v.

<u>Duval</u>, 183 F.3d at 10; <u>accord</u> <u>Taylor v. Lee</u>, 186 F.3d 557, 561 (4th Cir. 1999) (tolling "entire period of state proceedings" under section 2244(d)(2) "upholds 'the principle of comity that underlies the exhaustion doctrine'").  In particular, consistent with the requirement that a petitioner exhaust state court remedies, section 2244(d)(2) tolls the period during which the petitioner is attempting to exhaust such remedies in the state court system.  <u>See</u> <u>generally</u> <u>David v. Hall</u>, 318 F.3d at 345 (noting, in the context of discussing section 2244(d)(2), that the reason for the tolling provision is obvious inasmuch as "a federal petition would likely be dismissed or held as premature . . . until state remedies were exhausted").

Moreover, section 2244(d)(2) tolls the entire period in which the state post conviction proceeding is pending.  Thus, the majority of circuits does not count the time period between the denial of a state post-conviction motion and the petitioner's filing of an appeal within the state court system.  <u>See</u> <u>Taylor v. Lee</u>, 186 F.3d at 560-561 & n. 3; <u>Killela v. Hall</u>, 84 F.Supp.2d 204, 207 & 211-212 (D.Mass. 2000) ("several courts of appeal have ruled, consistently, that a properly filed application for collateral review is indeed 'pending' during the time period that the state appeal petition is being prepared"); <u>see</u> <u>also</u> <u>Swartz v. Meyers</u>, 204 F.3d 417, 419-420 (3rd Cir. 2000); <u>Nino v. Galaza</u>, 183 F.3d 1003, 1005-1007 (9th Cir. 1999) ("AEDPA's statute of

limitations is not tolled from the time a final decision is issued on direct state appeal and the time the first state collateral challenge is filed because there is no case 'pending' during that interval"); <u>Guenther v. Holt</u>, 173 F.3d 1328, 1331 (11th Cir. 1999).  Consistent with the "requirement that state prisoners first exhaust all available state court remedies," section 2244(d)(2) excludes all of the time during which a properly filed application for post-conviction relief is pending. <u>Barnett v. Lemaster</u>, 167 F.3d 1321, 1323 (10th Cir. 1999).

Section 2244(d)(2), therefore, tolled the entire period during which petitioner was seeking state collateral review after he filed the motion for a new trial on July 31, 1997.  Section 2244(d)(2) therefore tolls the entire time from the July 31, 1997 filing of the motion to the time the single justice denied the motion for leave to appeal to the full court on April 27, 2004. Assuming that petitioner also receives the benefit of tolling during the time he sought reconsideration until May 25, 2004, when the single justice denied the motion for reconsideration, the petition is nonetheless untimely.  Between the denial of certiorari on December 16, 1996, and the filing of the new trial motion on July 31, 1997, a period of approximately 222 days ran on the one year period.  With approximately 143 days remaining as of May 25, 2004, petitioner had until the middle of October 2004

16

in which to file a section 2254 petition.[14]  Current counsel forthrightly admits that this petition, filed on May 25, 2005, is untimely.  Consequently, she relies on the doctrine of equitable tolling as a means to avoid dismissal.

Equitable tolling is undoubtedly available under section 2244(d).  The First Circuit formally recognized the doctrine of equitable tolling as applicable to the non-jurisdictional statute of limitations in section 2244(d) in May 2004.  Neverson v. Farquharson, 366 F.3d 32, 41 (1st Cir. 2004).  Prior thereto, the court assumed the applicability of the doctrine to section 2244(d), but found it unavailing either because of a finding that the lower court's refusal to equitably toll the statute was not an abuse of discretion, see, e.g., Donovan v. Maine, 276 F.3d 87, 92-94 (1st Cir. 2002); Delaney III v. Matesanz, 264 F.3d 7, 13-16 (1st Cir. 2001), or because the court rejected the doctrine's application outright.  See Lattimore v. DuBois, 311 F.3d 46, 55-58 (1st Cir. 2002) (denying equitable tolling and reversing lower court's finding that habeas petition was timely), cert. denied, 540 U.S. 963 (2003).

Equitable tolling to avoid the strictures of section 2244(d)(1), however, is the exception not the rule and is "invoked only 'sparingly.'"  Neverson v. Farquharson, 366 F.3d at

_____

[14]  At the August 10, 2005 hearing, petitioner and respondent agreed that the present petition should have been filed on or before October 10, 2004.

17

41 ("equitable tolling should be invoked only 'sparingly'");
Lattimore v. DuBois, 311 F.3d at 55 ("'[W]e have made it pellucid
"that equitable tolling, if available at all, is the exception
rather than the rule"'"); Donovan v. Maine, 276 F.3d at 93
("'equitable tolling, if available at all, is the exception
rather than the rule'"); Delaney III v. Matesanz, 264 F.3d at 14
("[i]n the AEDPA environment, courts have indicated that
equitable tolling, if available at all, is the exception rather
than the rule"). Resort to equitable tolling of the AEDPA's one
year limitations period is "'deemed justified only in
extraordinary circumstances.'" Neverson v. Farquharson, 366 F.3d
at 41; Lattimore v. DuBois, 311 F.3d at 55 (same); Donovan v.
Maine, 276 F.3d at 93 (same); Delaney III v. Matesanz, 264 F.3d
at 14 (same); accord David v. Hall, 318 F.3d at 346 ("[i]f
equitable tolling is available to extend section 2244(d)'s
limitations period, it can only do so for the most exceptional
reasons" or "only for the most exigent reasons"); see also Jobe
v. Immigration and Naturalization Service, 238 F.3d 96, 100 (1st
Cir. 2001) (stating, albeit in context of 180 day statutory
period applicable to immigration proceedings, 8 U.S.C. §
1252b(c)(3)(A) (repealed), that "equitable tolling is a
'sparingly' invoked doctrine").[15]

---

[15]  Jobe is useful because the case identifies five factors
that should guide a court in evaluating equitable tolling.  These
factors are:  "(1) a lack of actual notice of a time limit; (2) a

Petitioner "bears the burden of establishing the basis" for such tolling.  <u>Neverson v. Farquharson</u>, 366 F.3d at 41.  In general, "a litigant seeking equitable tolling bears the burden of establishing two elements:  (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way."  <u>Pace v. DiGuglielmo</u>, __U.S.__, 125 S.Ct. 1807, 1814 (2005).

In 2003, the First Circuit explicitly addressed and rejected the circumstances of an attorney error as warranting equitable tolling under section 2244.  <u>David v. Hall</u>, 318 F.3d 343 (1st Cir. 2003).  Like the case at bar, the attorney in <u>David</u> filed an affidavit explaining that he did not believe the AEDPA required the filing of the federal petition at an earlier date.  Both the magistrate judge and the district judge in <u>David</u> "agreed, that a mistake by counsel in reading the statute or computing the time limit is, at most, a routine error."  <u>David v. Hall</u>, 318 F.3d at 346.  The First Circuit in <u>David</u> went on to note that such an error "would not even constitute 'excusable neglect.'"  <u>David v. Hall</u>, 318 F.3d at 346.[16]

_____

lack of constructive notice of a time limit; (3) diligence in the pursuit of one's rights; (4) an absence of prejudice to a party opponent; and (5) the claimant's reasonableness in remaining ignorant of the time limit."  <u>Jobe v. Immigration and Naturalization Service</u>, 238 F.3d at 100 (citing <u>Benitez-Pons v. Commonwealth of Puerto Rico</u>, 136 F.3d 54, 61 (1st Cir. 1998)).

[16]  Like current counsel and petitioner in the case at bar (Docket Entry # 11, p. 7), the petitioner in <u>David</u> quoted <u>Lonchar</u>

Recognizing that attorney negligence is not enough to justify equitable tolling (Docket Entry # 11, pp. 10-11), petitioner attempts to distinguish his circumstances as evidencing "egregious conduct" on the part of current counsel. Putting aside the adjectives to describe the conduct, the conduct itself amounts to an error in calculating the one year grace period under section 2244. Current counsel attests that she was "under the incorrect belief that [petitioner] had one year to file his habeas petition from May 25, 2004 because I was under the faulty impression that the conviction did not become final until the [SJC] made its ultimate ruling--in this case denying the new trial motion." (Docket Entry # 12, ¶ 20). She avers that had she conferred "with able and available counsel at CPCS or with any knowledgeable attorneys, [she] would have filed the petition on time." (Docket Entry # 12, ¶ 31).

As current counsel admits, the error was an "honest" mistake. (Docket Entry # 12, ¶ 27). It was not an egregious mistake but, instead, a negligent mistake with egregious

---

v. Thomas, 517 U.S. 314, 322-323 (1996), for the principle that, "Dismissal of a first federal habeas petition is a particularly serious matter" because it "denies the petitioner the protections of the Great Writ entirely." (Docket Entry # 11, Civil Action No. 01-10537-GAO). The argument was unavailing in the lower court in David and, although the unpublished dicta is certainly not precedential, petitioner's similar argument here is equally unavailing. Lonchar was decided prior to the effective date of section 2244(d) and one of the "main purposes" of the AEDPA "was to compel habeas petitions to be filed promptly after conviction and direct review." Neverson v. Farquharson, 366 F.3d at 44.

consequences.  Current counsel did not intentionally or calculatingly miss the October 2004 deadline.  Likewise, she did not ignore a request to provide the case file so that petitioner could file a timely federal habeas pro se.  See Spitsyn v. Moore, 345 F.3d 796, 799-801 (9th Cir. 2003).[17]

As to diligence, current counsel pursued and obtained a PET scan and spoke with Drs. Mark and Rothfarb about petitioner's brain injury.  She did not, however, act in a particularly diligent manner in pursuing the state claims and it took her from May 1999 to October 2001 to marshal the facts and file the amended motion for a new trial.  See Delaney III v. Matesanz, 264 F.3d at 14 (noting the lower court's finding that the "while the petitioner had pursued a variety of claims over a nine-year period, he had not done so in an especially assiduous fashion").  Similarly, she failed to act in a particularly diligent manner in

---

[17] Petitioner's citation and reliance on Spitsyn is misplaced. First, the decision emanates from the Ninth Circuit and relies almost exclusively on Ninth Circuit case law.  Second, the "egregious performance of counsel" that the Spitsyn court found to warrant equitable tolling of the section 2244 time period was demonstrably more serious than the conduct of current counsel. The attorney representing the petitioner in Spitsyn not only ignored the statutory deadline but also kept the file thereby preventing the petitioner from taking advantage of the limited amount of time (15 days) within which to make a timely federal habeas filing after the petitioner's mother terminated the attorney's representation of her son.  See Spitsyn v. Moore, 345 F.3d at 798 & 801-801.  The facts in Spitsyn, which, significantly, the court characterized as "unique," also involved an attorney who was ultimately reprimanded by the state bar association.  Spitsyn v. Moore, 345 F.3d at 798.

filing the federal habeas.  Rather, she waited until what she believed was the last remaining day, May 24, 2005, to file the federal petition.  On May 24, 2004, all current counsel had to do was modify the state court brief and file the federal petition in a timely manner, a fact she acknowledges (Docket Entry # 12, ¶¶ 32-33).  See Donovan v. Maine, 276 F.3d at 93 ("[a]ll that the petitioner had to do to place those averments in issue in the federal court proceeding was to 'set forth in summary form the facts supporting each of the grounds'").  Thus, while this court finds that petitioner, suffering from an organic brain defect, acted in a diligent manner by communicating his concern about preserving his federal rights to current counsel and relying on her interpretation of the AEDPA,[18] current counsel herself was less than diligent.

Turning to a number of the other factors identified in Jobe, this court will assume, in petitioner's favor, that he lacked

---

[18]  Petitioner also filed the motion for a new trial on July 31, 1997, which tolled the running of the limitations period until April or May 2004.  Such conduct, which this court has considered and weighed in the course of issuing this recommendation, certainly bodes in favor of applying equitable tolling.  See Mosso v. Matesanz, 2001 WL 1688900 (D.Mass. Dec. 5, 2001) (assuming that even if the petitioner's attorney's inattention constituted "an extraordinary circumstance" that equitable tolling under section 2244 was "not appropriate unless the petitioner also can show that he acted diligently after the attorney's failures came to light"); see also Howell v. Crosby, 2005 WL 1554202 at * 2 (11th Cir. July 6, 2005) ("attorney negligence is not a basis for equitable tolling, especially when the petitioner cannot establish his own diligence in ascertaining the federal habeas filing deadline").

actual notice and that it was reasonable for him to remain ignorant given his mental condition and justifiable reliance on current counsel. Current counsel, however, had actual notice of the one year deadline albeit not its correct calculation. Tellingly, she avers that she was under an incorrect belief that petitioner "had one year" to file the federal habeas after the SJC's May 25, 2004 decision on the motion for reconsideration. Accordingly, she knew about the one year period.

As to constructive notice, both petitioner and current counsel had constructive notice of the time limit. As to petitioner's constructive notice, it is true that he suffers from an organic brain defect. After May 12, 1999, however, he was represented by current counsel.[19] The duration of the representation was lengthy. See Kelley v. N.L.R.B., 79 F.3d 1238, 1249 (1st Cir. 1996) (noting that appellant's constructive notice of regulations "is further supported by the duration of the representation she enjoyed"). In discussing the issue of imputing constructive notice in the context of equitable tolling, the court in Kelley cited to Lopez v. Citibank, N.A., 808 F.2d 905, 907 (1st Cir. 1987), a case involving an appellant with a mental illness. See Kelley v. N.L.R.B., 79 F.3d at 1249 (citing Lopez v. Citibank, N.A., 808 F.2d at 907). Declining to adopt an

---

[19] Even prior to May 12, 1999, petitioner managed to file the pro se motion for a new trial on July 31, 1997, a significant filing that tolled the running of the limitations period.

23

absolute rule of tolling on mental insanity grounds, the First
Circuit in <u>Lopez</u> found it significant that the appellant's mental
illness did not deprive counsel of the knowledge or consent
needed to file a timely complaint.[20]  Here too, petitioner's
organic brain defect did not deprive current counsel of an
ability to make a timely federal filing.  To the contrary,
similar to the circumstances in <u>Lopez</u>, current counsel knew
petitioner wished to pursue federal remedies and knew about the
relevant one year deadline.  (Docket Entry # 12, ¶¶ 20-23).

Prejudice is also a factor to consider in assessing the
propriety of equitable tolling.  Given the passage of time, there
is certainly prejudice to the prospect of retrying this case.

---

[20]  The court in <u>Lopez</u> noted the significance that the
plaintiff, who was mentally incapacitated during much of the 18
month limitations period, was represented by counsel who managed
to file a complaint and pursue the discrimination claim before
the Equal Employment Opportunity Commission.  The court's
reasoning is particularly apt to the case at bar:

> Appellant was represented by counsel during his period of
> illness, and counsel pursued appellant's discrimination
> claim before the EEOC.  It thus seems unlikely that
> appellant's illness deprived his counsel of the knowledge or
> consent needed to file a court complaint; it is more likely
> that counsel knew plaintiff wished to pursue his legal
> remedies and knew (or should have known) about the relevant
> limitations period.  And, appellant has alleged no specific
> facts that would show the contrary.  In such circumstances,
> we believe a federal court should assume that the mental
> illness was not of a sort that makes it equitable to toll
> the statute--at least absent a strong reason for believing
> the contrary.

<u>Lopez v. Citibank</u>, 808 F.2d at 907.

See <u>David v. Hall</u>, 318 F.3d at 347 (recognizing that "grant of habeas relief leaves the state free to retry the petitioner, but this becomes increasingly hard to do as memories fade, evidence disperses and witnesses disappear").  As correctly reasoned by respondent, bringing a habeas claim 24 years after the homicide occurred would prejudice respondent and defending the "habeas claim based on new scientific evidence regarding a brain injury" 20 years "after the crime would be extremely difficult."  (Docket Entry # 13).

As to the reasonableness of remaining ignorant of the time limit, current counsel knew about the deadline but did not devote the minimal amount of time to contact a knowledgeable attorney and ascertain the correct manner in which section 2244(d)(2)'s tolling operated in petitioner's case.  While it was reasonable for petitioner to remain ignorant of the correct calculation of the deadline and of the deadline itself, it was not reasonable for current counsel to remain ignorant about the application of section 2244(d)(2) tolling given that the statute employs the word "pending" and nothing was "pending" between the conclusion of direct review on December 16, 1996, and the filing of the motion for a new trial on July 31, 1997.

Finally, this is also not a situation where a petitioner is afforded no other avenue of post conviction relief.  <u>See</u> <u>David v. Hall</u>, 318 F.3d at 346 n. 4 (noting in parenthetical that the

25

court excused a one day delay due to an attorney error "where the petitioner faced the death penalty and *would not have any other avenue of post-conviction relief*") (emphasis added).  To the contrary, the state courts fully reviewed and rejected the claims.  In addition, petitioner notes an intent to pursue in the future in state court an ineffective assistance of counsel claim under <u>Commonwealth v. Saferian</u>, 315 N.E.2d 878 (Mass. 1974).  Respondent correctly points out, however, that the ineffectiveness of counsel during federal or state collateral proceedings is not a cognizable basis for relief under the AEDPA.[21]  <u>See</u> 28 U.S.C. § 2254(i).

It is also worth noting that the fourth, fifth, seventh, eighth and eleventh circuits reject the contention that an attorney's negligence or miscalculation of the AEDPA's deadline constitutes an extraordinary circumstance sufficient to warrant equitable tolling.  The same egregious consequence of foreclosing federal habeas review was present in all these cases.  <u>See</u> <u>Helton v. Secretary for Department of Corrections</u>, 259 F.3d 1310, 1313 (11th Cir. 2001) ("'[a]ny miscalculation or misinterpretation by [the petitioner's] attorney in interpreting the plain language of the statute does not constitute an extraordinary circumstance sufficient to warrant equitable tolling'"); <u>Kreutzer v. Bowersox</u>,

---

[21]  Judicial economy therefore does not demand that this court as opposed to a state court address the merits of the habeas petition.

26

231 F.3d 460, 463 (8th Cir. 2000) (the petitioner's attorney's failure to recognize importance of section 2244(d)(1)'s one year period or his confusion did not warrant equitable tolling); <u>Molo v. Johnson</u>, 207 F.3d 773, 775 n. 8 (5th Cir. 2000) (rejecting argument that the ineffectiveness of the petitioner's attorney resulting in missed AEDPA deadline justified tolling); <u>Harris v. Hutchinson</u>, 209 F.3d 325, 330 (4th Cir. 2000) (mistake by the petitioner's attorney in interpreting section 2244(d) did not warrant equitable tolling);[22] <u>Taliani v. Chrans</u>, 189 F.3d 597, 597-598 (7th Cir. 1999) (miscalculation and inadequate research by the petitioner's attorney causing him to miss section 2244(d)(1) deadline did not warrant equitable tolling).

In sum, weighing and analyzing the totality of the circumstances, <u>see</u> <u>Donavan v. Maine</u>, 276 F.3d at 93 ("[w]hat matters is that the court painstakingly weighed and analyzed the totality of the circumstances" in applying the equitable tolling doctrine), this court finds that equitable tolling is not available.

---

[22] Petitioner's citation to the Fourth Circuit case of <u>Frasch v. Pequese</u>, 2005 WL 1579790 (4th Cir. July 5, 2005), does not hold otherwise. Thus, although the effect in <u>Frasch</u> may have been to allow a belated filing notwithstanding an attorney error, the case concerned the interpretation of what constituted "direct review" under state law to trigger the running of the statute of limitations under section 2244(d)(1). <u>See</u> <u>Frasch v. Pequese</u>, 2005 WL 1579790 at * 1 (4th Cir. July 5, 2005) ("As we will explain, Frasch's federal habeas petition was timely under a straightforward application of § 2244(d)(1)(A)").

27

CONCLUSION

In accordance with the foregoing discussion, this court **RECOMMENDS**[23] that the motion to dismiss (Docket Entry # 9) be **ALLOWED** and that the petition be **DISMISSED** as untimely under the AEDPA.


    /s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge

---

[23] Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten days of receipt of the Report and Recommendation to which objection is made and the basis for such objection. Any party may respond to another party's objections within ten days after service of the objections. Failure to file objections within the specified time waives the right to appeal the order. United States v. Escoboza Vega, 678 F.2d 376, 378-379 (1st Cir. 1982); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).